EDWARD S. MATTHEWS *vs.* CHARLES E. FULLER & another.

Suffolk.    Nov. 20. — Dec. 11, 1877.    COLT & LORD, JJ., absent.

B., a broker, advised A. to sell certain unregistered bonds and buy certain other bonds. A., in reply, by letter, said, "I am most anxious to get my money in registered bonds," authorized B. to sell the bonds then held by B. for him, " and invest the amount in the best paying and surest bonds that you know of." "As these bonds are all I possess, I am naturally always anxious about them, for the reason that, if lost or stolen, I could recover nothing. You will please invest the results of the sale in the I. bonds, [the ones recommended,] or any sure road." "I want registered bonds of which I will have no trouble in drawing the interest." "I shall feel under many obligations if you will kindly make such sale and purchases of bonds as your good sense dictates." It was agreed that the bonds referred to by B. were first-mortgage bonds. B. in fact bought some first-mortgage and some second-mortgage bonds, all of which were unregistered. *Held*, that, if he acted in good faith, it was within the scope of the authority conferred upon him by the letter of A.

On the issue whether A., by failing to object to a purchase of certain bonds by B. on A.'s account, had ratified the purchase, A. contending that he only authorized the purchase of registered bonds, while those bought were unregistered, A. testified that he knew from his wife that the bonds had been bought; that it was a tabooed subject between them; that she grew very excited over it; that they had lost all confidence in the bonds, and considered them worthless two years before he repudiated the purchase; that he knew it from what a third person told him; that this person said that B.'s reputation was not worth a copper; that he would not leave a ten-dollar bill with him. The judge, in instructing the jury, called their attention to the fact that the plaintiff had testified that he knew the bonds were worthless, that he had lost his money, and that the subject was so painful to his wife that it was tabooed between them; but omitted to state what the plaintiff testified as to his means of knowledge, and left it to the jury to say whether it was a fair inference from the plaintiff's testimony, that, two years before the repudiation, he was in possession of knowledge that his instructions to B. had not been complied with. *Held*, that A. had no ground of exception.

CONTRACT for money had and received. The declaration also contained counts in tort, alleged to be for the same cause of ac-

tion. Writ dated November 2, 1874. Trial in this court, before *Soule*, J., who allowed a bill of exceptions in substance as follows:

It appeared in evidence that, at some time prior to June, 1871, the plaintiff, a surgeon in the United States navy, left ten bonds of the Union Pacific Railroad in the keeping of the defendants, who were bankers and brokers in Boston ; that on June 21, 1871, he sent the following letter, signed by him, to the defendants : " Please hand over to Mrs. Matthews the $10,000 in Union Pacific bonds which you now hold belonging to me. Remove the coupons due next month, and after selling the gold send Mrs. M. a draft for $100. The remainder please hold on deposit; and as I shall increase it from time to time, I shall request you to invest it judiciously. Mrs. Matthews will call at your office for the bonds. If convenient, please hand her a draft, due July 1st, for $100. I shall send you gold drafts from Brazil, which I request you will invest; " that on June 23, 1871, the plaintiff sailed from Portsmouth, New Hampshire, on the United States steamer Ticonderoga, for a cruise on the east coast of South America.

. It further appeared in evidence that, on June 21, the plaintiff's wife came to Boston and informed the defendants that her husband had instructed her to get his bonds from them, and hire a safe in the Union Safety Deposit vaults, in Boston, and place the bonds in it, and exhibited to the defendants a written order from her husband to them, to deliver the bonds to her; that the defendants then advised her, and she concluded that it would be safer, to leave the bonds in their keeping, which she did ; and that the defendants then wrote the following letter to the plaintiff : " Boston, June 23, 1871. Dear sir : We told your wife today that if the U. P. bonds were our own we would not hold them all, but would sell half of them, and put the balance into something else, although the condition of the road is better at this time than at any time since the bonds were issued ; and she remarked that she might want to use them, or part of them, in Rio, which would be a very difficult thing to do, as we presume that they are not known in that market. We also suggested that in case of loss, by theft or otherwise, there could be nothing recovered ; whereas, if you had registered bonds of some

kind, no loss of the bonds would affect your title to them, or the power to draw the interest regularly. We wish that you had taken Iowas (7% gold) ; they are now 95, and few for sale ; we knew that they would advance when the road was completed."

To this letter the plaintiff replied from Rio de Janeiro on August 25, 1871, as follows: " I have the pleasure to acknowledge the receipt of your kind letter, which reached me yesterday. You are probably aware that the bonds which are in your keeping constitute my entire wealth ; they are all I have, and naturally I desire to have them in safe keeping, and hence my acceptance of your kind offer of your box in the Safety Deposit vault. You recommend Central Iowas, and advise me to sell my Pacifics and buy them. If the Pacifics go up to 90, — accrued interest to be added, — I think it well to sell them. I have lost the run of the market, and therefore I must leave the sale of these bonds to your judgment. I am most anxious to get my money in *registered bonds*, so that, if lost, I can recover. Therefore, if Pacifics are as high as at any past period, — say 90, accrued interest to be added, — or as high as it is probable they will go for a long period, you may sell all of them, and invest the amount in the best paying and surest bonds that you know of. As these bonds are all that I possess, I am naturally always anxious about them, for the reason that if lost or stolen, I could recover nothing. I don't recollect what Iowas were when you advised me to buy. You will therefore please to invest the results of the sale of the Pacifics in the Iowas (seven per cent. gold), or any sure road. Mrs. M. writes me you offered to take the same interest in the sale and purchase of bonds for me as if you had a personal interest in them, and therefore I will leave the sale of the Pacifics to your good sense, and superior knowledge of the stock market. Is there not a probability of the Pacifics going up to par when the company withdraw their ten per cents ? Could you not get me Iowas in exchange for Pacifics, even ? I want registered bonds, of which I will have no trouble in drawing the interest. Of course I desire to sell all, as the same objection exists to possessing a thousand as exist to having ten thousand. From time to time, I will send you gold drafts on England, which you will please place to my credit, and invest in safe, liberal paying bonds. I have sent Mrs. Matthews an order for one hundred

dollars, which you will please honor. I shall feel under many obligations if you will kindly make such sale and purchases of bonds as your good sense dictates."

The defendant, who wrote the above letter of June 23, testified, on being shown the letter, in cross-examination, that this letter was written with a view to getting the plaintiff to invest in Iowas; that of course he intended to have him understand that Iowas could be registered; but he added that the letter spoke for itself.

It appeared that the Iowas mentioned in the defendants' letter of June 23 were the first-mortgage bonds of the Central Iowa Railroad; that the defendants had them for sale for said railroad; and that, prior to June 23, the defendants had recommended them to the plaintiff as an investment. It further appeared that in July, 1871, the defendant began selling for the Central Iowa Railroad its second-mortgage bonds; and that on October 3, 1871, the plaintiff's wife called on them, and they showed her the above letter of the plaintiff's of August 25, 1871, and they wrote, and she signed and gave them, the following order: " October 3, 1871. Please sell five thousand dollars U. P. first mortgage, at eighty-eight, or better, and buy five thousand Iowa second. Mary E. Matthews;" that the defendants thereupon sold five of the plaintiff's bonds, and invested the proceeds in five of the second-mortgage bonds of the Iowa Central, which they had for sale. The defendants also received the following letter from the plaintiff, enclosing the drafts therein mentioned: " Rio de Janeiro, Brazil, September 4, 1871. Herewith I enclose to you a draft on London for £101 10s. 6d., in your favor, at sixty days; also one on London at sight, for £50 5s. 2d. in your favor. Please invest the results of the sale of these bills in such stock as may seem most desirable. If you consider the Iowas good, — sure beyond doubt, — put the money in them. If it is agreeable to you, I will be glad to have you invest for me such money as I may, from time to time, be able to send to you."

It also appeared that the following correspondence ensued between the defendants and the plaintiff's wife: " Providence, R. I., October 10, 1871. C. E. Fuller & Co.: How are the bonds; have you sold them, and what do you think of the Union Pacifics? It seems to me that the fall in bonds, now since the

fire in Chicago, would make a good time to buy Iowas. I hope you sold the Pacifics before the news came. I had a letter from the doctor a day or two since, and he says he wants to get registered bonds, but I suppose they are very high. What kind of registered bonds are there to be had, and how much are they? Mary E. Matthews."

" Boston, October 11, 1871. Mrs. Mary E. Matthews: We have received your favor of the tenth, with enclosures as stated. We have exchanged five thousand dollars of your Union first-mortgage 6's for Iowa Centrals. We have suffered no loss from the Chicago disaster, but think it would have the effect rather of enhancing the value of the Iowas. The market on Union Pacific 6's has declined steadily, closing last night in New York at $82\frac{3}{8}$ and interest bid. The Iowa Central bonds can be registered by forwarding the bonds to the company's agents, they only giving you a receipt, interest being collected by a power of attorney. We think it would be better for you, if you wish to make any change, to hire a safe in the Safe Deposit Company, for twenty dollars a year. We are sorry you did not give us an order to sell the other 5M. Union Pacific 6's, but we could not sell without an order, although we thought advisable so to do. They may rally, and if you wish us to exchange the other five for Iowas, without loss to you, we think it advisable to do so, and will, on your written order to that effect. C. E. Fuller & Co."

" Providence, R. I., October 13, 1871. C. E. Fuller & Co. Yours of the eleventh is just received. I am glad you did not suffer by the loss of property in the Chicago fire. It is queer that it should affect the Union Pacific 6's so much. I do not want to sell as low as $82\frac{7}{8}$, for I think some of the bonds cost that, and I want to make something on them; but I will trust to your good judgment, and give you an order to sell the remaining five thousand whenever you have a good opportunity, and change them for Iowas or other bonds. If you think best you might buy some Iowas with the one thousand dollars in your hands; of course use your judgment about it. If you know of any other good investment it may be well to have some money in other things. I leave for New York on Friday, and when I return to Providence I will come to Boston; if you think best, get a box in the Union Safe Deposit. Below is my order to

sell, if you think proper; but I would rather keep the Union Pacifics, and hope for a rise after a time, of course. I will do as you think safest and best. You know I want to do as near as the doctor would if he were here, so I have to be very careful. I perceive, however, that it is necessary for you to have my order to sell, and, although I don't like the responsibility, I suppose I must take it. I am very much obliged to you for attending to my affairs so promptly, and if you will be kind enough to let me know when you make any change, I will be greatly obliged.

" Sell five thousand Union Pacific 6's.   Mary E. Matthews."

" Boston, October 16, 1871.   Mrs. Mary E. Matthews, New York.   We have to-day sold the coupons in the five thousand Iowa bonds, and bought one thousand Iowa Equipment bond. C. E. Fuller & Co."

The bond mentioned in defendants' letter of October 16 was of the same kind as the other five above mentioned. These six bonds, with the five Union Pacific bonds, remained in the defendants' keeping until January 6, 1872, when the plaintiff's wife gave the following order to the defendants: " Boston, January 6, 1872. Messrs. C. E. Fuller & Co. Please exchange the balance of my Union Pacifics first-mortgage (5000) for Iowa Central first-mortgage 7% bonds. Mary E. Matthews." The defendants thereupon sold the five Union Pacific bonds then in their hands, and invested the proceeds, in five $1000 Central Iowas first-mortgage bonds, which they had for sale at 95.

The defendants also sent the plaintiff the following letter: " Boston, October 23, 1871. Mr. E. S. Matthews, Rio de Janeiro. Dear Sir: We have received your favor of September 4th, with enclosures as stated, and we have sold the draft of £101 10s. 6d. @ 8%, or 487.32 gold, and the draft for £50 @ 108¾, or 242.91 gold, which we sold at 114¾, crediting your account 837.94. We have also exchanged for you 5000 of the Union Pacific bonds for Iowas, leaving a balance in your favor of $63.20, and sold the coupons from the same for $198.62, making your account stand: [Then followed a statement of the account.] Mrs. Matthews did not wish to have all the U. P. bonds exchanged at that time, but as matters have turned, we are sorry that she did not, as there has been a great fire at Chicago, involving

a loss of two or three hundred million dollars; in consequence of which, values are quite disturbed, and all railroads, that are any ways connected with Chicago, have experienced a great decline, and U. P. with the rest, while the Iowa road, being connected with St. Louis, is benefited by the disaster. Stock and bonds have recovered in a great measure from the decline, and soon probably will sell at the old figures. We think the exchange a first-rate one, and hope that Mrs. M. will decide to exchange the balance of the lot when she can realize the same price; as the Pacific bonds, though undoubtedly safe, have so much of a speculative nature, that you cannot rely upon the price; while the Iowa road is steadily increasing its business, and we think must take its place with one of the best managed and most prosperous roads of the West. We shall be most happy to hear from you at any time, and any business that you may send us will have our prompt attention. C. E. Fuller & Co."

It appeared that there was a monthly mail between New York and Rio de Janeiro, by steamer, and extra ones by way of England and Portugal; that the plaintiff and his wife corresponded, and received letters monthly from each other; that he was cruising on the coast of South America, but went into port monthly for the mails; and that he never missed a mail but for one day.

The plaintiff testified that he received the letter of October 23, 1871, and he produced the letters of the defendants to himself and wife, and put them in evidence with the letters of his own and those of his wife.

The bonds of the Iowa Central, in which the defendants invested as above, were mortgage coupon bonds. The defendants testified that these bonds could be registered on being sent to the office of the railroad company, the mode being by an indorsement thereon : " This bond is payable only to the order of — "

The plaintiff's wife testified that before the investment in the Central Iowa bonds was completed, she asked the defendants, if they were registered, and they replied that they could be registered; that she would have to send them to some one out West; and that they would collect the interest. As they would have to go out of her hands, she said she would not let them go, and nothing was done about it. She also said that she did not know

what registered bonds were, and never knew there was any other way of registering bonds. She testified in cross-examination, that she wrote her husband what the defendants had done, truly as she understood it; but, on re-direct examination, that she did not write him that the bonds were not registered. The letters were not produced by the plaintiff, as all of their correspondence with each other had been destroyed by them.

It appeared that the Iowa Central bonds were left by the plaintiff's wife with the defendants, for safe keeping, until April 17, 1872, when she sent for and obtained them by express, upon her order, cut off two years' coupons and gave them to one Peirce, a broker or banker in Providence, for collection, and when she went to South America left the bonds with her father, who held them for her until the fall of 1874, when her husband returned from Europe. The last coupon paid in money of the first-mortgage bonds was the one due January 1, 1873; of the second, that due October 1, 1872. The subsequent coupons falling due were paid in scrip, or new unsecured bonds with coupons attached.

It also appeared that up to January 1873, the first-mortgage bonds kept up to ninety cents or upwards on a dollar, in the market, and that the second-mortgage bonds were sold by subscription only, at eighty-five cents on the dollar; that after January 1873, the first declined until they sold at fifty-three in June 1873; and, in January 1874, they sold at forty-six, and sales of the seconds ceased at about the same time; and that neither class of bonds has ever been of any higher value since.

It also appeared that the plaintiff was on a cruise between ports in Uruguay, Buenos Ayres and Brazil, until February 1874, and he testified that he was closely occupied in his duties; that his wife was in Uruguay about six months, between October 1872 and June 1873; that they were together there about two months; that during that time the yellow fever prevailed, and confined the plaintiff closely to his professional duties, and the remainder of the time of his cruise she was in the United States, that they corresponded monthly; that he returned to New York from Brazil in February 1874; that he left the ship, and was engaged in official business for a week or more; that his wife joined him, in pursuance of a telegram sent her to Providence,

and they spent four or five days in New York together, she being ill, and he attending her as a physician; that he took her to Maryland, where she was too sick to attend to business; and that, while she was convalescent, he went to Europe for his own health; that he was gone two or three months, and returned, arriving in Providence in August 1874. He testified that he and his wife were on good terms when in South America; that he knew that the bonds had been bought; knew it from his wife; that it was a tabooed subject while she was in South America; that she grew very excited over it; that they had lost all confidence in the bonds, and considered them worthless when his wife was there; that he was sure of that from what an officer told him; that he regarded the bonds as worthless; that his wife was there six months; that he knew of the purchase of the Iowas; that he regarded the bonds as worthless from the time of the purchase; that he regarded them so from the time he heard they were bought in 1871 or 1872; that he learned of the purchase of Mrs. Matthews, and from the defendants; that he reached this conclusion in the autumn of 1871; that he did not write nor have communication with the defendants afterwards; that he wrote to his wife on the subject; that he did not know that he got an answer; that he did not write her again on the sub ject; that he formed his impression about the bonds from what he was told. He was asked what he was told, and said that the captain's clerk said to him, " You are a madman; you are crazy. Would n't leave a ten dollar bill with them. Reputation not worth a copper; " that the engineer told him the same things; that after that he took no pains to see if they were good; that he had the American papers, but did not know whether he looked at the stock lists; that his wife came home in 1873, he in 1874; that he had no communication with the de-fendants after he learned the condition of the bonds and came to this conclusion; that he did not go to see them nor communicate with them until November 1874, when, just before the com-mencement of this suit, he tendered back the Iowa Central bonds and the scrip or bonds taken for unpaid coupons, and demanded back the Union Pacific bonds through his counsel; and that he then went and got the bonds and gave them to his counsel for that purpose.

The plaintiff introduced evidence tending to show that neither he nor his wife were informed, until after his return from Europe, that the defendants were agents of the Central Iowa Railroad Company for the sale of its bonds, or that the eleven Central Iowa Railroad bonds, when bought, were not registered. The defendants denied and controverted this by other evidence tending to show that he did know these facts all the time; that he had been in Boston about a year before he sailed, and had business dealings with them, and was fully informed of their relation to the company, and that they were selling the bonds for it; that they had tried to negotiate the exchange before he left. The plaintiff and his wife testified that he never instructed her to act in the sale or exchange of his bonds.

The defendants contended, and introduced evidence tending to show, that the company put said bonds upon the market in Boston, through them and other brokers, at fixed and limited prices for each class of bonds, the brokers being allowed and paid by the company an agreed commission; that they took pains to fully inform themselves in regard to the same, and believed in them as an investment; that, acting under their written authority, they sold the Pacific bonds and invested in the Iowas for the plaintiff in good faith, and in the exercise of their best discretion and judgment, and in all things with due fidelity, believing the exchange was judicious, and the new investments perfectly safe, and for the best interests of the plaintiff.

The plaintiff took no steps to repudiate the action of his wife, or of the defendants, in the premises until November, 1874, when, after consulting counsel, he made the tender and the demand through his counsel, as above stated. The defendants charged and took no commissions from the plaintiff for what they did.

The plaintiff sought to recover only the value of the Union Pacific bonds, or the money invested in the Iowa Central bonds, in repudiation of the investments made in the latter, and contended that the written instructions and authority limited the defendants to investing in registered bonds; that the investments made in the Iowas were not safe or proper; and that the Iowas were not registered bonds.

The judge, among other instructions covering the whole case, and not excepted to, instructed the jury as follows:

" 1. That by the letters, the defendants were not limited to investing in registered bonds, but that the matter was left to their judgment; and they must use their best judgment and make as safe an investment as they reasonably could; that permission to invest in Iowas did not relieve them from using their best judgment.

" 2. That the defendants, being brokers or agents for the railroad company for the sale of the bonds, were bound to disclose the fact to the plaintiff; and if they failed to do so, and concealed it from the plaintiff and his wife, this would render them liable; but, if they did inform them of the fact, they were still bound to put the money in what they believed to be safe; that they did not do their duty if they took advantage to palm off Iowas, merely because they were agents for the sale, not believing in them.

" 3. That the defendants were bound to use their best judgment, to act fairly, prudently and in good faith, and, if they did do so, they were justified in investing as they did.

" 4. That if they failed to do their duty, the plaintiff had a right to repudiate the transaction upon learning the facts and becoming so satisfied; that if a broker, instructed to sell and invest in a certain way, sells and invests in a different way, the person can repudiate and call on the broker to respond, either the bonds, or for damages equal to the bonds and the money; that if the plaintiff chose to repudiate, he was bound to do it with reasonable despatch, upon learning the facts; that he could not, after obtaining the requisite knowledge, lie back for an indefinite period, taking his chances of the market, supposing the undertaking was to put the plaintiff's money in safe securities, or safe registered securities, as the plaintiff claims; that whenever he learned the facts and was satisfied that the defendants had violated their duty in not putting the money in a safe bond, the plaintiff's duty was to repudiate at once, not at the moment, but within a reasonable time.

" That the plaintiff had testified that he became satisfied, immediately after he heard of the investment, that the bonds were worthless, and that he had lost his money; that the subject was so painful to his wife that it was tabooed between them while she was in South America; and it was for the jury to say

whether it was a fair inference from his testimony, that from the fall of 1872 he was in possession of knowledge that his instructions to the defendants had not been complied with, and that the transaction was one which he had a right to repudiate ; if he was, and delayed for two years or more to repudiate the transaction, he must be regarded as having elected to accept it, unless the jury found from the evidence that there was such a state of facts, by reason of ill health, his local position, his duties or his inability to communicate with the defendants, as to prevent action on his part, or excuse the delay."

The jury, after retiring, returned and asked the judge for further instructions as to what was to guide them as to reasonable time for repudiation. The judge instructed them that it was the duty of a person desiring to repudiate, to do so at once after learning and being satisfied of the facts, that is, as soon as he reasonably could ; that he has no right to delay for the purpose of taking his chances ; that he must use reasonable despatch, considering the circumstances ; that if there was a physical obstacle that could not be overcome, that was an excuse ; but if it was his mere personal convenience, inattention or carelessness, it was not ; that the jury must determine whether an unreasonable delay occurred under the circumstances and facts appearing in evidence.

The plaintiff then requested the judge to rule that reasonable delay may have resulted from the absence of the plaintiff from the United States. The judge read this request to the jury, but did not give the same in that language, instructing them only that they might take that fact into account, considering the frequency and means of communication, and his opportunities for notifying the defendants ; and added that it was not necessary that he should be personally present to give the notice and tender back the bonds ; that he might send to an agent to do it, and have it done through him, as was done, for instance, by his counsel, ultimately.

The jury returned a verdict for the defendants ; and the plaintiff alleged exceptions to the refusals to rule as requested, and to all the instructions given which are reported, except the third.

*T. L. Livermore*, for the plaintiff. 1. It appears from the uncontroverted testimony of the plaintiff and his wife, that she had

no authority to act in the sale or exchange of the bonds. The defendants must therefore rely on the authority as shown by the plaintiff's letter of August 25, 1871. The allusions in that letter to Iowa bonds, it is agreed, relate only to the first-mortgage bonds of the Central Iowa Railroad, while the defendants bought second-mortgage bonds. Moreover, the letter, fairly construed, authorizes the purchase of only registered bonds. Were it not for the last clause, no question could arise on this point, and this clause is a mere general expression which must be limited by the special authority previously given. 2 Rol. Ab. 409. *Moore* v. *Magrath*, Cowp. 9. *Sandiman* v. *Breach*, 7 B. & C. 96. *Browning* v. *Wright*, 2 B. & P. 13. *Rossiter* v. *Rossiter*, 8 Wend. 494. *Williams* v. *Higgins*, 30 Md. 404. Wharton on Agency, § 222.

2. The fourth instruction of the court alleges, as a matter of fact, that the plaintiff testified that he considered the Iowa bonds worthless; that immediately after he heard of the investment " he became satisfied the bonds were worthless and that he had 'lost his money." This omitted the material circumstance, that the plaintiff testified that he came to this conclusion from what an officer told him, which was, that he (the officer) " would n't leave a ten dollar bill with them. Reputation not worth a copper." This was said of the defendants, and excited merely a suspicion that they could not be trusted; but it did not give any definite information to the plaintiff concerning the good or bad faith of the defendants in this transaction nor concerning the value of the securities. Indeed, it was impossible for the plaintiff to have known anything against the bonds at this time, for this was in the autumn of 1871, and both classes of the Iowas kept up to the price for which the defendants exchanged them for the plaintiff, and interest was paid on them, until January, 1873, after the officer told the plaintiff of the defendants, and after the plaintiff's wife left America for Brazil.

*A. A. Ranney*, for the defendants, was not called upon.

ENDICOTT, J. The defendants sold for the plaintiff, under certain instructions, ten bonds of the Union Pacific Railroad, and invested the proceeds in bonds of the Iowa Central Railroad. The plaintiff contends that the instructions directed the defendants to change the Union Pacific bonds for registered bonds, that the Iowa Central bonds were not registered, and that

the defendants did not act in good faith. The defendants contend that the instructions did not require them to invest the proceeds in registered bonds, that the defendants did act in good faith, and that the plaintiff, after knowing all the facts, neglected for more than two years to object to the transaction and thereby accepted and ratified it.

The presiding judge stated to the jury that the instructions, contained in the plaintiff's letters, did not limit the defendants to an investment in registered bonds, but the matter was left to their judgment; that they must use their best judgment, and make as safe an investment as they reasonably could, and that the permission given them by the plaintiff to invest in Iowa Central bonds did not relieve them from exercising their best judgment. He also instructed the jury, that the defendants were bound to act fairly, prudently and in good faith in the transaction. We see no ground of exception to these instructions.

The plaintiff does in his letters express a decided wish to have his money put into registered bonds, and says that he is anxious to do so, but after considering the subject at some length and giving no definite instructions, he concludes by saying, " I shall feel under many obligations if you will kindly make such sale and purchases of bonds as your good sense dictates."

It is urged as an objection to the fourth instruction to the jury, that the presiding judge stated, as matter of fact, " that the plaintiff had testified that he became satisfied, after he heard of the investment, that the bonds were worthless and he had lost his money," and omitted to state the ground on which the plaintiff said he came to this conclusion, respecting which he testified later in his examination. The instruction of the presiding judge is not open to this objection; for while he did not state in terms the ground on which the plaintiff came to that conclusion, the jury were also told " it was for them to say whether it was a fair inference from his testimony, that from the fall of 1872 he was in possession of knowledge that his instructions to the defendants had not been complied with, and that the transaction was one which he had the right to repudiate." The presiding judge did not tell the jury what was proved as matter of fact, but, after calling their attention to a statement

of the plaintiff, left it for them to say, on all his testimony, whether he knew in 1872 that the instructions, he contended were given, had not been complied with. This was an important question for the jury to consider, if they found it necessary to determine whether the plaintiff, by failing to object for two years or more, had ratified the sale and purchase.

*Exceptions overruled.*