ST. LOUIS GUNNING ADVERTISING COMPANY, Respondent, v. WANAMAKER & BROWN, Appellant.

**St. Louis Court of Appeals, November 28, 1905.**

1. **PRINCIPAL AND AGENT: Raticfiation:. Assumed Authority: Notice.** Where a principal, after receiving notice that his agent has assumed to bind him by an unauthorized act, remains silent, and that silence induces the party dealing with the agent to pursue a course which would be detrimental to him if the principal was not held bound by the act, a ratification of the unauthorized act by the principal will be presumed.

2. ———: ———: ———: **Estoppel.** The ground on which the principal is held liable, by constructive ratification or ratification by conduct, is that of estoppel, because he has behaved in such a way that the party dealt with by the agent would be injured if the transaction were repudiated.

3. ———: ———: ———: ———. Where a party made a contract with the agent to do certain advertising, extending over a period of several months, which contract was beyond the agent's authority, and, during the period covered by the contract notified the principal and demanded pay for the advertising, the principal by failing to answer the notice and request was estopped to disclaim liability for the advertising charges accruing subsequent to the date of the notice.

4. ———: ———: ———: **Jury Question.** The silence of the principal in such case was a fact relevant to the issue of intentional ratification and it was a question for the jury to determine whether there was such intentional ratification so as to make the principal liable for the service rendered before the notice.

5. ———: **Special Agency.** Where the agent of a clothing house in a distant city opened a shop and displayed the sign of his principal with his own name beneath, followed by the title

St. Louis Gunning Adv. Co. v. Wanamaker & Brown.

"Selling Agent," his agency was a special one and limited to such powers as were expressly or impliedly covered by the designation.

6. ——: ——: **Estoppel.** Where a principal has placed an agent in such a position that a person of ordinary prudence, conversant with the usages of business and the nature of that particular business, is led to believe the agent has certain authority, and without negligence deals with him on that assumption, the principal is estopped to repudiate the agent's act or agreement.

7. ——: ——: **Incidental Powers.** Where an agent is given authority to do certain acts, the law presumes that he is also vested with authority to do all acts which are necessary to the execution of the authority expressly given.

8. ——: ——: ——: **"Necessary" Acts.** By "necessary" incidental powers is not meant merely "appropriate" or "expedient," but such powers as are requisite for the accomplishment of the main purpose of the agency.

9. ——: ——: ——. Whether a selling agent for a tailoring establishment had the incidental authority to make contracts for advertising the business would depend upon whether the advertising to the extent contracted for was necessary.

10. ——: ——: ——: **Jury Question.** Whether the selling agent of a tailoring establishment, in making a contract for advertising the business on billboards for a period of six months for a compensation of fifty dollars a month was performing a necessary act, so as to raise the presumption of incidental authority to make the contract, was a question about which different inferences might fairly be drawn, and was therefore a question for the jury.

Appeal from St. Louis City Circuit Court.—*Hon. Matthew G. Reynolds,* Judge.

REVERSED AND REMANDED.

*Abbott & Edwards* for appellant.

Plaintiffs contracted with Lurie as selling agent, and therefore knew the limits of his authority. A sell-

ing agent has no implied authority to bind his principal for advertising. Tarpey v. Bernheimer, 16 N. Y. Supp. 870. Ratification can arise from silence only "Where there is a duty to speak and the party upon whom the duty rests, has an opportunity to speak, and knowing the circumstances requiring him to speak, keeps silence; or in other words, where his silence amounts to a fraud, actual or constructive." 11 Am. and Eng. Ency. of Law, page 427.

*Edward N. Robinson* for respondent.

The term "selling agent" has no special significance in this State. His authority must be ascertained from the nature of his business, and from the manner in which he is held out to the public by his principal. In this case Lurie was in reality a local manager of the defendant, placed in charge of its branch store. He had implied authority to do everything necessary for the proper conduct of that business. He was not a salesman on the road. Sudduth v. Empire Lumber Co., 79 Mo. App. 585; Hoppe v. Saylor, 53 Mo. App. 5; McLaughlin v. Barker, 64 Mo. App. 511; Rider v. Kirk, 82 Mo. App. 124. Defendant knew of the execution of this contract one week after it was entered into. Defendant received a letter from plaintiff demanding payment when the contract was one-half executed, and wrote its agent that plaintiff had appealed to it for payment. Defendant did not reply to the letter from plaintiff, but continued to accept the benefits of the contract until its completion, when it closed its St. Louis store. The ratification was clear and complete. Porter v. Merrill, 138 Mo. 555, 39 S. W. 798; Wharton on Agency and Agents, sec. 85-86; Tiffany on Agency, p. 69; Taylor v. Bank, 174 N. Y. 181.

St. Louis Gunning Adv. Co. v. Wanamaker & Brown.

STATEMENT.—This is an action to recover rentals alleged to be due for six months advertising on billboards at different stations in the city of St. Louis. Both plaintiff and defendant are incorporated companies, the former engaged in business in the city of St. Louis and the latter in Philadelphia. The advertisements were ordered by a written contract signed "Wanamaker & Brown, A. Lurie, selling agent." The defense is that Lurie had no authority to bind the defendant. Plaintiff relies on both an original authority to Lurie, and, in default of such authority, ratification by the defendant. The advertisements were painted and displayed at the different stations in accordance with the contract and the aggregate rentals of $50 a month, for six months, were earned. Lurie formerly represented the defendant, a merchant tailor, in Kansas City. He opened a store of the same sort at Tenth and Olive streets in St. Louis in the early part of 1903, under an arrangement by which he was to bear the rent and other expenses. The defendant furnished Lurie with some six hundred dollars worth of goods for display purposes and samples, he giving a bond to indemnify defendant against loss from having furnished the goods. Lurie took orders for men's clothing and the suits were manufactured in Philadelphia and shipped from there to St. Louis for delivery to customers. He was charged for clothing shipped to him, whether accepted or rejected by the customer, and his profit was the difference between the price he paid and what he got. He was carried on the books of the company as an agent, and the stationery used by him ran in the name of Wanamaker & Brown. A sign hung above the store containing the name Wanamaker & Brown; but there is a dispute as to whether the words "A. Lurie, selling agent" were on it. Defendant knew the sign, whichever way it read, was

115 app—18

there, as it had a photograph of the store showing the sign. Lurie was entirely in charge of the St. Louis business and gave the order to the plaintiff for the advertisements which constitute the subject-matter of this action. The order was given July 16, 1903, and on November 20, 1903, before the expiration of the term for which the signs were ordered and when three months' rent was due, plaintiff wrote Wanamaker & Brown in Philadelphia, stating that Lurie, as defendant's representative, had ordered the bulletin-board advertisements for six months, what rent was due and that he had not made payment, but, in excuse, said he had received no check from the home office. In the letter plaintiff requested the defendant to take the matter up and have at least a partial payment made. The defendant wrote to Lurie on the subject, protesting against the expense, but did not write the plaintiff in answer to its letter, though an answer was requested. Some incidents appear from the correspondence between the defendant and Lurie which throw light on their relations. The exact date when Lurie opened business in St. Louis is not stated. It must have been in the early part of 1903; for there is a letter from him to the defendant under date of December 12, 1902, in which he proposed the arrangement between him and the defendant. Other letters show the business was going prior to May, 1903. Sometime between those dates, then, it was opened. On May 8, 1903, defendant wrote Lurie complaining that the words "selling agent" did not appear on the sign over the door, as shown in the photograph of the store sent to defendant; also stating that under no circumstances must defendant's name be used for the purchase of goods, or for other purposes than "as an advertisement" which would enable Lurie to do a larger business than he could do in his own name. In the same letter defendant told him to establish his own credit and do business under

his own name. The letter complained of two suits that had been brought against Wanamaker & Brown on account of the St. Louis business, and said that such matters were annoying, and that Lurie had been previously told he had better adjust them instead of leaving them open to an action. It was also stated that the mercantile agencies had called for a rating of Wanamaker & Brown in St. Louis, and had been informed that it had no interest in the St. Louis store. On May 13th, defendant wrote Lurie that a business concern in St. Louis had written concerning an order by Lurie for wadding and asking if there was a limit to Lurie's order. The letter stated that the concern had been notified that the St. Louis store was Lurie's exclusive property. Lurie was told to discontinue signing orders for goods with the name of Wanamaker & Brown, and to sign his own name instead. Lurie explained by letter that the two suits of which complaint was made in defendant's letter of May 8th, were instituted by customers who were dissatisfied with garments they had ordered and that the cases had been adjusted. Defendant, in a letter of May 13th, stated that this explanation was satisfactory. Lurie's explanation was given under date of May 11th, and adverting to the complaint defendant had made about his name not appearing on the sign with the words "selling agent," he said the words "A. Lurie, selling agent," appeared on the *window signs*. July 24th Lurie wrote that he expected an immense fall trade and was having twenty signs put up around St. Louis by the Gunning System, to be ready for it. On November 25th, defendant wrote Lurie the following letter:

"November 25, 1903.

"Mr. A. Lurie, St. Louis, Mo.

"Dear Sir: We have had so much trouble with the business in St. Louis that we have finally lost all patience and shall discontinue any connection forthwith.

The last thing to come to our notice is the contract made for six months' billboard advertising and the concern has appealed to us for payment. We have been informed a number of times that all business was transacted as Wanamaker & Brown's. This, of course, we know to be so, for a number of times bills have been received from concerns who have charged the goods to Wanamaker & Brown. There is no evidence in the sign used by you that the business belongs to you; everything is Wanamaker & Brown, and we must decline to have our good name brought into disrepute in your dealings with the trade in general in St. Louis. We have placed the settlement of all matters with the attorneys who will hand you this letter. It would be useless at this time to ask us to change our decision. The agency at St. Louis has given us more worry and concern than all the balance of our business combined; we think we have borne with you patiently, but now patience ceases to be a virtue. We had hoped, of course, that we could continue to do business with you in the future, but realize now that it is impossible to continue, as we cannot see from the facts before us but what the same difficulties and complaints would arise in the future. If you come east in January, we should be glad to have you call and see us.                    "Yours truly,

                    "WANAMAKER & BROWN."

That letter was evoked by the one plaintiff wrote defendant November 20th, referred to above, in which defendant was told that Lurie had contracted for the billboard advertisements, that three months' rent was due, and asked to take the account up with Lurie and have him make a payment. It seems Lurie told the Gunning company that Wanamaker & Brown had complained because his (Lurie's) name was not on the bulletin-boards; for on December 5th, the Gunning company wrote defendant that Lurie had so stated and

St. Louis Gunning Adv. Co. v. Wanamaker & Brown.

assured defendant that "A. Lurie, selling agent" appeared on all the boards rented from the plaintiff. As no answer was sent to plaintiff's letter requesting defendant to have Lurie pay something on the advertising account, plaintiff wrote again on January 28, 1904, calling attention to the matter, stating that the bulletin-board service had been inaugurated August 23d and would expire February 23d; that Lurie had put off payment, offering various excuses, and asking defendant to send a check for the amount due by return mail or plaintiff would take action. Defendant made no reply to this letter, but on February 6th, wrote Lurie that it had decided to quit business in St. Louis as none of his promises had been kept; and, further, that defendant had been presented with a bill for $300 for advertising, accompanied with the threat that if not paid, action would be taken.

The court refused to direct a verdict for defendant and, instead, gave the following instructions:

"1. The court instructs the jury that although you may believe from the evidence that at the time the contract read in evidence was executed by A. Lurie, said Lurie had no authority from the defendant to execute said contract for the defendant, yet if you believe and find from the evidence that defendant was informed by plaintiff of the existence of said contract, and that plaintiff looked to defendant for payment thereof about November 20, 1903, and that defendant did not disclaim liability under said contract, nor notify the plaintiff that said Lurie had no authority to execute the same from defendant, but permitted plaintiff to continue to furnish the advertising service under said contract, then such failure constituted a ratification of the act of said Lurie in executing said contract, and your verdict will be for plaintiff for the entire amount sued for.

"2. The court instructs the jury that if you believe

from the evidence that the plaintiff furnished A. Lurie, for the defendant, the advertising service mentioned in the evidence under the contract read in evidence, and that at the time of the execution of said contract, the said A. Lurie had no authority from said defendant to execute said contract for the defendant, yet if the jury believe and find from the evidence that said defendant by its agents or managers, after said execution of said contract by said A. Lurie, the defendant then knowing that Lurie had contracted for said advertising for defendant, received and accepted said advertising and used the same for his own benefit, then such receipt, acceptance and use was a ratification of the contract of said Lurie and your verdict will be for the plaintiff for the amount due for said advertising at the contract price.

A verdict for $300 was returned in favor of the plaintiff, and judgment having been entered on it, the defendant appealed.

GOODE, J. (after stating the facts).—1. The ground for a verdict in favor of the plaintiff allowed by the instructions, was that defendant had ratified the contract made by Lurie in its name. The first instruction treated the defendant's failure to disclaim liability within a reasonable time after receiving plaintiff's letter of November 20th, as in itself a ratification. Every fact hypothesized in that instruction was undisputed; hence, the charge was equivalent to directing a verdict for the plaintiff. We think the instruction went too far, in view of the fact that plaintiff had already performed half the contract before it wrote the letter and could not have been induced by defendant's silence to render that much of the agreed service, and of the further fact that defendant's silence did not induce the plaintiff to refrain from proceeding against Lurie personally while it might have collected the rent from him. The silence

of a principal, after receiving notice that his agent has assumed to bind him by an unauthorized act, may be a fact to be weighed on the issue of whether the principal ratified the act, or may raise a presumption that he ratified it, according to circumstances. If the controversy between the agent and the third party is completed before the principal is notified, so that no detriment can result to the third party from the silence of the principal, his failure to repudiate the act is evidence to be considered with other facts in the case, that he adopted it as his own, or ratified it. [Union Gold Mining Co. v. Bank, 2 Colo. 248, 262; Breed v. Bank, 4 Colo. 481, 507; Culver v. Ashley, 1 Am. Lead Cas. (5 Ed.), note p. 719; Horton v. Townes, 6 Leigh (Va.) 47, 60; Bryant v. Moore, 26 Maine 84, 87; Bates' Excrs. v. Bests' Excrs., 13 B. Monroe, 215, 218; Corser v. Pauk, 41 U. S. 24, 31; Philadelphia, etc., Ry. v. Cowell, 28 Pa. St. 329.] And it will be conclusive evidence of ratification if not explicable on any other theory. [Bank of Ky. v. Schuykill Bank, 1 Parson's Eq. Cas. 180, 267; Hart v. Dixon, 5 Lea (Tenn.) 336, 339.] But if the transaction is still in progress, and the silence of the principal, after notice, induces the party dealing with the agent to pursue a course which would be detrimental to him if the principal was not held bound, a ratification of the unauthorized act will be presumed. This result will obtain when the person dealt with is induced to alter in any way his position to his detriment; as by parting with money or property on the assumption that the agent's act was valid; or omitting to take steps against the agent; or otherwise to improve his position. [Union Mining Co. v. Bank; Breed v. Bank, supra.] The result will obtain, too, when the principal accepts the benefit of what the agent did. [McLachlin v. Barker, 64 Mo. App. 511.] The cases abound in such remarks as that a principal must disavow the conduct of an agent done in

excess of authority, in a reasonable time after getting notice of it, on pain of being deemed to have assented to the conduct; and some decisions hold that the disavowal must be immediate. But the prevalent doctrine is that it must occur in a reasonable time. These remarks are to be construed with reference to the facts before the court; and we think the true doctrine is that a conclusive presumption of acquiescence is raised from a principal's silence, only when otherwise loss would fall on an innocent party. The contrary doctrine would be arbitrary and irrational; and such rules of law should be avoided. An examination of numerous cases has shown that in every instance wherein the presumption of ratification was raised because of a principal's silence, some change in the position of the parties concerned occurred subsequent to notice to the principal, which would have resulted in injustice to the party dealt with by the agent if the principal had been excused on the score of want of authority in the agent. We cite illustrative decisions on the point. [Peck v. Ritchey, 66 Mo. 114; Teasdale v. McPike, 25 Mo. App. 341; Johnston v. Berry, 3 Ill. App. 256; Hanks v. Drake, 49 Barb. 186; Hawkins v. Lange, 22 Minn. 557; Farwell v. Howard, 26 Iowa 381; Cooper v. Schwartz, 40 Wis. 54; Pittsburgh, etc., R. R. v. Wooley, 12 Bush (Ky.) 451; Marshall v. Williams, 2 Biss. 255; Woodward v. Luydon, 11 Ohio 360; Matthews v. Fuller, 123 Mass. 446; Foster v. Rockwell, 104 Mass. 167; Ruffner v. Hewitt, 7 W. Va. 585.]

The real ground on which the principal is held liable under such circumstances is that of estoppel; though it is often said that the principal ratified what was done by his agent by remaining silent. [Teasdale v. McPike, 25 Mo. App. 341; Hoppe v. Saylor, 53 Mo. App. 4.] In its genuine sense, ratification depends on intention. It is the voluntary assumption, on full information, of an

unauthorized act or agreement by the party in whose be-
half it was done or made.   The intention to ratify may
be manifested by express words or by conduct.   Either
may establish that the principal elected to adopt the act
or agreement as his own; and the election once made
with knowledge of the facts, becomes irrevocable.   Be-
sides a true ratification intentionally made, the law
recognizes a constructive one where none was intended.
The latter sort of ratification is a legal presumption,
raised against the principal because he has behaved in
such a way that the party dealt with by the agent would
be injured if the transaction was repudiated.   It is
really an equitable estoppel and is regulated by the law
of estoppel.   The estoppel may arise from the fact that
the principal was silent when he ought to have declared
his intention not to be bound by the agent's act; provid-
ed, as said above, his silence leads the party dealt with
to alter his position for the worse.   This is identical with
the principles governing estoppel by acquiescence in
other instances not involving the relation of principal
and agent.   The question often arises directly between
an agent and his principal, in cases where the latter tries
to hold the former responsible for acting without author-
ity.   In such litigation, if the principal does not prompt-
ly repudiate the transaction, but waits until doing so
will cause loss to the agent, or until it appears that the
transaction will cause loss instead of profit to himself,
he will be estopped to deny responsibility.   A class of
cases which frequently present the matter for decision, is
where a broker or commission merchant has bought or
sold property for a principal contrary to instructions.
In such instances the principal is not permitted to re-
main silent after notice in order to watch the course of
the market, and determine whether he will adopt or re-
pudiate the deal according as it may prove profitable or
the reverse.   [Teasdale v. McPike, supra.]   In the pres-

ent case it is certain the advertising to November 20th was not done by plaintiff in reliance on defendant's failure to answer the letter of that date; and, hence, defendant's silence is not ground to estop it from denying liability for installments of rent which had accrued previously. In other words, the presumption that it ratified the contract Lurie made with plaintiff ought not to be raised merely from its silence when notified of the contract. But it is estopped to disclaim liability for the rent of the bulletin-boards accruing subsequent to the date it had notice. Plaintiff requested a reply to its letter; and, in view of the fact that Lurie was conducting business in defendant's name, a reply should have been made. In commercial affairs prompt answers to such notifications are rather strictly insisted on by the law. Plaintiff supposed it had a contract with defendant and was furnishing the advertising service on that supposition. Hence, the presumption is fair that if defendant had repudiated the contract, plaintiff would have terminated the service at once. The advertising tended to increase defendant's sales and was beneficial to it as well as to Lurie. Therefore, defendant was interested in its continuance. A case exactly like this, as to the immediate point, and in which similar rulings were made, is Bryce v. Clark, 16 N. Y. Supp. 854. [See, too, Cornelius v. Reiser, 18 N. Y. Supp. 113.]

In view of certain facts established by the proof, we have doubted if defendant's omitting to answer plaintiff's letter requesting a payment on the rent due for advertising, was evidence for the jury on the question of an intentional ratification by defendant of the contract. In other words, whether the facts of the present case permit the application of the rule that the silence of a principal on receiving notice of an act done by his agent in excess of authority, is evidence of ratification when the third party dealt with is not prejudiced by the prin-

cipal's silence. This point depends on whether the proof against an intentional ratification of the contract with plaintiff, was so positive as to leave no room for the finding that it was ratified. It is certain that defendant was chagrined when it learned Lurie had contracted in its name for the advertising, at once protested against the contract, and, because of it and other instances of unsatisfactory conduct, terminated business relations with him. But neither to Lurie nor the plaintiff did defendant declare an intention not to be bound by the agreement, and its attitude on that question was not made clear by anything it said or did—perhaps was not determined at once, but left open for further consideration and decision after legal advice was taken. It was, at least, equivocal so far as the record shows. As no conclusion on this point is compelled by the evidence, we hold the issue of intentional ratification was for the jury, and that defendant's silence was a fact relevant to that issue. If the defendant at any time purposely ratified the agreement, it could not disclaim liability thereafter. [Andrews v. Ins. Co., 92 N. Y. 596; Brock v. Jones, 16 Texas 461; 1 Parsons, Contracts (9 Ed.), p. 50, note (h).]

2. The proposition is advanced by plaintiff's counsel that the defendant is liable because Lurie's contract for advertising fell within the scope of his authority as selling agent, and the trial court should have directed a verdict for their client on that ground. In discussing this phase of the case we shall assume that Lurie was, in truth, what he was held out to be: an agent of the defendant, charged with the duty of conducting a tailoring establishment in its name and taking orders for men's garments. Just what the precise legal relationship between Lurie and the defendant was—whether that of jobber and customer, principal and agent or partners (see Meyers v. Field, 37 Mo. 434), will not be

determined; because the most that is claimed by the plaintiff is that he was an agent; and though the defendant asserts he was an independent dealer, it does not deny he was held out as a special agent. Therefore, as the case is presented, the decision of the immediate point turns on the extent of his real or apparent powers. It must be kept in mind that in what is said concerning the apparent powers pertaining to Lurie as agent, we mean such powers or authority as would have appeared to belong to him if, in fact, he had been appointed agent by the defendant—such authority as a man would seem to possess if designated as selling or sales agent, and placed in charge of a stock of merchandise for the purpose of selling. We do not refer to the fact that his agency was merely apparent; for, as said, it is, for the present purpose, taken for granted that he was in truth an agent, as he was represented to be. The question for decision is, then, Did Lurie as agent of the defendant have authority to bind it by the contract in question? The facts on which hangs the answer to this question stand undisputed and are these: the defendant's main business office or establishment is in Philadelphia; the evidence goes to show defendant is a tailoring concern of prestige and reputation; it had intrusted Lurie with a considerable stock of goods suitable to be manufactured into men's clothing; he was commissioned to open an establishment in defendant's name, in a large city, and procure orders for tailor-made garments by showing the goods in his custody and ostensibly selling cloth off the bolts; the garments were manufactured in defendant's Philadelphia establishment according to orders and measurements taken by Lurie in St. Louis and transmitted; but the impression gathered from the evidence is that this fact was not known to the customers, nor intended to be; Lurie was permitted to display defendant's name on signs and

stationery, with his own name beneath and followed by the title "selling agent;" that the character of his agency was special and not general was denoted by his title of selling or sales agent, and as such plaintiff dealt with him. Those are the facts on which the authority in him to make the contract for advertising in defendant's name, is affirmed and denied. To the public eye the business Lurie conducted must have appeared to belong to the defendant and to be a branch establishment under the management of an employee. The title by which that employee was designated, signified that he was not a vice-principal or general manager; but one appointed to perform a particular duty and therefore of restricted powers, among which the primary power was to make sales. The public had the right to assume he was authorized to sell—to take and fill orders for men's garments; for that act was within the main purpose of his commission as signified by the title "selling agent." He had no express power to incur expense in defendant's name for advertising, either on bulletin-boards or in other modes. This does not mean that he had neither real nor apparent power to do so; but simply that the power was not expressed in the words of his commission. The power was not explicitly conferred. Whether or not it was implicitly conferred, or whether, in view of the character and circumstances of the agency, it appeared to have been conferred, we must determine. It has proved difficult and, we may say, impossible, to reach a confident conclusion on these points; which, as will appear below, we deem to converge into a single point, when narrowly scrutinized. The books teem with adjudications about what acts of various sorts, agents may or may not do beyond the express words of their commissions; but no case very analogous to this one has been found in an exhaustive search for a precedent. Therefore we have been compelled to resort to elemen-

tary principles and rules. But among the general rules by which the authority of agents is controlled, are two that, in their struggle for enforcement, conflict in close cases; and which of the two ought to control the decision in this controversy, as likely in many others, is hard to say. One rule seeks to protect principals against wrongful assumptions of authority by agents; and to do this gives special weight to the doctrine that a man has the right to extend or restrict the powers of his agent as his judgment dictates. The other rule seeks to protect the public against losses due to the appearance of power in an agent; and, therefore, emphasizes the maxim that where one of two persons, both free from a fraudulent motive, must lose in consequence of the act of one of them, he whose innocent act entailed the loss must bear it. This principle lies at the root of most of the rules concerning the apparent authority of agents. [Story, Agency, sec. 127, and note.] The perplexity in particular cases, and in this one, is to know whether the third party, by failing to inquire as far as prudence demanded concerning the agent's authority to do the contested act, brought about a situation from which loss must occur; or whether the situation was due to the principal's having unwittingly lent to his agent the semblance of right to do the act. The problem arises when there is no doubt that the authority the agent assumed to have was never intentionally conferred on him. But it is by no means always easy to say whether or not the authority for a given act was conferred either by design or inadvertence. It is usually plain that it was or was not within the language of the agent's commission, the language being undisputed. In the present case it is plain that express authority to advertise was not given; for no authority but to sell was expressed. But it is not, for that reason, plain that Lurie was not authorized to advertise, as a measure essential to the performance

St. Louis Gunning Adv. Co. v. Wanamaker & Brown.

of the duty to sell; no positive restriction against advertising having been imposed on him. As intimated above, real authority may be implicitly as well as explicitly contained in a commission. Hence, it is to be ascertained if Lurie was impliedly commissioned to contract for advertising or appeared to be.

Text-writers are accustomed to enumerate categorically the sources of an agent's authority; and it will be useful to examine those sources for light on the point in hand. Putting aside authority expressly vested, which Lurie lacked; authority by ratification which has been considered above, and that springing from the right to assume powers to avoid loss in an emergency, which is not germane to the facts, there remain the authority derived from custom or general usage, that derived from a principal's conduct in permitting an agent to act outside the scope of his commission as expressed in the language used, and that authority called incidental, which accompanies express authority. One ground of liability on the part of a principal which is akin to, or a corollary of, the two sources of authority last stated, may be found in the following rule recognized by the books: Where a man has placed an agent in such a position that a person of ordinary prudence, conversant with the usages of business and the nature of the particular business, is led to believe the agent has a certain authority and, without negligence, deals with him on that assumption, the principal is estopped to repudiate the agent's act or agreement. [Johnson v. Inv. Co., 46 Neb. 480; McNichols v. Nelson, 45 Mo. App. 446.] A standard author says a principal is responsible when he justifies a party dealing with his agent in believing he has given authority. [1 Parsons, Contracts, 44.] *But when has he given it or justified a party in believing he did?* are the points of difficulty. No proof was adduced in the present case to show what are the customary powers of

agents like Lurie; and we know not that there is a cus-
tom attaching any power to them.  Neither was there
proof that the defendant had recognized contracts made
by him in its name, or tolerated a course of business
which would entitle the plaintiff to believe in his right
to make the contract in issue.  If defendant had done
what gave plaintiff the right to presume in favor of
Lurie's authority, so as to estop it from denying respon-
sibility, it is because his being in charge of an establish-
ment conducted by him as sales agent, in defendant's
name, would so naturally raise the belief in a prudent
mind that he was authorized to make the agreement in
dispute that, according to the law of estoppel, the de-
fendant ought to be held.  If defendant is exonerated,
it is because the words "selling agent" were such notice
to plaintiff of the limit of Lurie's authority that it was
put on inquiry, and contracted at its peril if it failed
to inquire. The correspondence shows other persons be-
sides plaintiff were imposed on by Lurie's appearance
of authority.  But aside from this matter of estoppel,
Lurie may have had actual authority for the contract,
because to advertise was necessary in order to sell.  The
law presumes a principal intends to vest an agent with
power to do auxiliary acts which are essential to the
discharge of the agency, unless they are forbidden. And
even when they were forbidden, but the party dealt with
was unaware of the fact, the same presumption arises.
Though all apparent authority is actual authority in
legal effect, sometimes it is *real* as proceeding from the
intention of the principal, and sometimes *fictitious,* as
legally presumed.  Now when the validity of an agent's
agreement or act is drawn into question and depends
on an incidental authority, the rule that he may do all
things necessary to accomplish the purposes of the
agency, and the rule that the principal is bound by an
estoppel if he has attached such circumstances to the

agency as to induce reliance on the agent's power to agree or act in a matter, would seem to converge and be, in effect, only different methods of giving effect to one principle, to-wit: that an incidental authority must spring from necessity. In other words, third parties will not be held justified in assuming power in a special agent to do a given act as incidental to his agency, unless the act is necessary to the execution of the appointment. Does this rule mean that the thing done must have been absolutely indispensable, or appropriate, or merely convenient? If it is indispensable, in what respect? Indispensable in order to start the business of the agency, or to make it a success? And who shall decide upon the necessity; the court or the jury? Is it an issue of law or of fact? As to the first question we find a diversity of rules, or, at least, of statements. It has been declared to be the duty of third persons dealing with an agent, when the nature of the agency is known (i. e., that it is special) to ascertain the extent of the authority the agent may exercise; and that the principal will not be bound by any act not warranted expressly by, or fairly and necessarily implied from, the terms of the authority delegated. [1 Clark and Skyles, sec. 206c, pp. 486, 489, and cases cited in footnote.] But it has been held, too, that all appropriate and reasonable modes of executing a conferred authority are included in it. [Nat'l Bank of Republic v. Bank of Baltimore, 112 Fed. 726; Mechem, Agency, sec. 311.] Advertising is an appropriate means for attracting custom and making sales; and if the authorities just cited state the rule accurately for special agents, undoubtedly Lurie had the power to incur moderate charges for advertising. But to bind a principal by any contract made by a special agent which a court or jury may deem appropriate to the purpose of the appointment, would encroach

greatly on the doctrine that holding an agent out as special warns the public to inquire concerning the scope of his authority. Much of the protection to principals afforded by that doctrine would be lost, and lax dealings with agents by third parties encouraged. Under the guise of powers appropriate to the chief duty of an agent, principals could be involved in contracts and enterprises foreign to their intention and which they never authorized. It is a reasonable view that a special commission, such as Lurie held, is given in order to retain in the principal control over the business or transaction confided to the agent, except in so far as the latter is empowered to act either by the terms of his commission or usage or necessity. In our judgment it is best to be conservative in making one person responsible for what another does. Much injustice results daily from unduly extending such responsibility, both in cases of principals and agents, and masters and servants. It is true that the business of this age requires manifold agencies unknown to the past; and true that the transaction of affairs with the celerity demanded by the spirit of the times, requires that principals, especially incorporated companies, should be bound by the doings and agreements of their agents more than they formerly were. But it is true, too, that the facilities for ascertaining the authority conferred on agents, have been vastly increased. Where once a slow mail might be weeks or months in bringing an answer to an inquiry, now the railroad or telegraph will bring it in a few hours or minutes. There seems to be no good reason for relaxing the rules on this subject whose justice has been proved by long experience.

The few cases we have found which treat of the powers of an agent in charge of goods, have justified incurring expense for the principal only when it was absolutely necessary, as opposed to expedient, to do so;

like renting a storeroom or borrowing money to pay freight on the goods so as to get them from a carrier. [Baldwin v. Garnett, 111 Ga. 876; Tucker v. Woolsey, 64 Barb. 562; Rankin v. McFarlane Carriage Co., 75 S. W. (Ky.) 221.] The word "necessary" in common usage, connotes different degrees of necessity. [Cotton v. County Comm., 6 Fla. 620, 629.] It sometimes means indispensable; at others, needful, requisite, incidental, or conducive. [Chambers v. St. Louis, 29 Mo. 543.] In its primary sense it signifies a thing or act without which some other thing or act cannot exist or be done. [Commonwealth v. Morrison, 9 Ky. 75, 85.] Lurie's authority was special. Now, as Lurie was not given entire control over the particular business, but only the right to do specific acts (make sales), he was a special agent. [1 Clark and Skyles, Agency, p. 6.] Therefore, the natural inference is that as to policies and expedients to promote the business, but not indispensable to its successful management, and about the wisdom of which opinions might differ, the defendant intended to reserve the decision to itself; and for that reason gave Lurie a title which denoted restricted authority. Hence, our opinion is that the word "necessary," as applied to determine, in this case, the agent's power to do an incidental act, should be held to mean an act or measure requisite to enable him to discharge his main duty; something more urgently required than is signified by the words "appropriate," "suitable" or "expedient." It should not be held to mean an act without which the agent could not move at all toward achieving the main object of the agency; or without which, at a given stage, efforts to perform must utterly cease; but one requisite for the achievement of it according to the desire and intention of the principal; an act necessary in the sense that the main scope and object of the agency must fail unless it is done. We speak, of course, in view of the

fact that no usage on the subject is shown. We think an instruction in the present case defining the word in the sense we have indicated would be correct. The tailoring business can be carried on without extensive advertising on bulletin-boards, or otherwise; but advertising is used as a means to increase business in cities where competition is keen. It is a good means to build up custom and sometimes may be necessary, according to the meaning of the word we have pointed out as the proper one to adopt in the present case; though not necessary in the sense that the business is absolutely impracticable without it.

As to whether the question is one of law or fact, is to be determined next. Text-writers give long schedules of acts which the courts have decided agents may do or not, as incident to their duty; such as the incidental powers of cashiers, adjusters of insurance losses, factors, managers of plantations, superintendents of mines and other kinds of agents. Most of these adjudications turn on usage having vested the agent with the right he exercised. No doubt around many agencies which are of wide and ancient vogue, for instance bank cashiers, custom has so firmly crystallized certain acts as incidentally authorized, that the courts are justified in judicially noticing and enforcing the custom. As said, the existence of the usage is a question of fact, and its effect on a contested transaction a question of law. So where an apparent authority is asserted on a course of dealing pursued by an agent, the question of whether the principal has tolerated such dealings is for the jury. If he is found to have done so, the legal result is that he is bound by the act he disputes. But besides such instances, there are many in which courts have pronounced for and against the power without regard to usage, or the previous course of business, and purely on the theory

of incidental necessity. We find decisions that this
question must be remitted to the jury. In Nicholson v.
Golden, 27 Neb. 132, it was said the apparent authority
of an agent was to be gathered by the jury from all the
facts and circumstances in evidence; citing Brooks v.
Jameson, 55 Mo. 505; Sigerson v. Pomeroy, 13 Mo. 620;
Howe v. Machine Co., 32 Iowa 435, and Hough v. Ins.
Co., 3 Wood & M. 529. In the Nicholson case the point
for decision was not whether the agent had power to do
what he did as incident to a power expressly conferred;
but whether he had been given full control over the af-
fair intrusted to him for settlement, as to which point
the testimony was contradictory. So in Hull v. Jones,
69 Mo. 587, the question of fact for the jury was as to
the existence of an agency in the person who had acted
as agent; not the scope of his authority. In Brooks v.
Jameson, the point decided was that the power of an
agent may be proved by the habit of the business; which
means, of course, that where similar actions to the one
performed by the agent are proved to be customary, the
act is valid. In Sigerson v. Pomeroy, the question was
whether the agents had departed from their conceded in-
structions or had obeyed them. In Howe v. Machine
Co., there is a dictum of the same purport as the one in
the Nicholson case. In Hough v. Ins. Co., the agent's
authority was to be deduced from what he had done,
coupled with the recognition of his doings by the com-
pany he represented; therefore the inquiry did not re-
late to incidental powers. There are cases more in
point. In Johnson v. Inv. Co., 46 Neb. 480, it was said:
"Whether or not an act is within the scope of an agent's
authority is to be determined . . . as a question of
fact from all the circumstances of the transaction and
the business." This rule was approved and followed in
Holt v. Schneider, 57 Neb. 523, 530, and in Reid v. Kel-

logg, 8 S. Dak. 569. In the latter case the court said: "The evidence upon the questions presented was such that different minds might reasonably draw different inferences therefrom. . . . While the question as to the actual agency, upon undisputed facts, is usually one of law, the question of ostensible agency depends so largely upon inferences and conclusions drawn from these facts, as to be a question of fact." The above are the only decisions we have found by American courts which squarely hold that the question of what incidental powers an agent possesses as necessary to enable him to execute the purpose of his agency, is to be determined by a jury. In Arthur v. Barton, 6 M. & W. 138, it was held that the necessity of an agent's incidental act was for the jury; and that is the English rule. [See, too, Loudon, etc., Soc. v. Bank, 36 Pa. St. 498; Huntley v. Matthews, 90 N. C. 101.] In Gulick & Holmes v. Grover, 33 N. J. L. 463, the power to do the act in question depended on the previous course of business followed by the agent with the principal's consent, there being no dispute about the facts. The court said that when the facts are conceded, the question of whether the agent had the requisite authority to bind his principal is for the court. In Day & Frees v. Lumber Co., 93 N. W. (Neb.) 688, the court examined the facts and held that the agent of a lumber company appeared to have power to waive a mechanic's lien. In Davies v. Steamboat Co., 94 Maine 379, it was said to be for the jury to decide whether the captain of a passenger steamer had power to charge the owner with the duty of delivering telegrams addressed to passengers, and that the decision depended on whether the particular act was necessary to the successful promotion of the principal's business. But despite these remarks the court decided the point itself, by ruling that the steamboat company owed no duty to its passengers to receive and deliver telegrams

as incident to its business, and that the act of the captain in taking the message to deliver to the person addressed was outside his duty; that the company would not be liable unless it held the captain out to the world as having authority. A reading of the Missouri cases we have cited will disclose that the courts of this State have assumed frequently to decide the question of necessity. This occurred in the large majority of the cases wherein the inquiry as to incidental authority was involved. In truth, but little attention has been given to the question of whether the court or the jury should determine the issue of necessity; probably because the right to act or not, in most instances, was deemed to be obvious. After attentive study of the question, our best judgment is that the necessity of advertising to the extent Lurie did, in order to make sales which would be profitable and thereby realize defendant's desire and purpose in establishing the agency, is so close a question under present-day business habits in cities, that different inferences fairly may be drawn by different minds concerning whether plaintiff was justified in believing he had the right to contract for the advertising as incidental to his agency. In that contingency the point is one of fact and ought to be determined according to the experience and opinion of a jury. This rule was announced in the Nebraska and Dakota cases above cited, is the one observed by the English courts and was approved, if not adjudged, in Nicholson v. Golden, supra. [1 Clark and Skyles, Agency, p. 495, sec. 208; 1 Parsons, Contracts, 44; Huffcut, Agency, sec. 103; Johnson v. Hurley, 115 Mo. 513, 22 S. W. 492; Griggs v. Shelden, 58 Vt. 561.] It appears to accord with the definition of apparent authority commonly given in text-books; that it is such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally sup-

pose the agent to possess. Much of the apparent authority of an agent, whether asserted as incidental, or on usage, or on the agent's previous course of dealing, rests on the principles of the doctrine of estoppel. The question is rather what third persons had the right to believe concerning the agent's powers, than what powers the principal intended to confer. [Story, Agency, sec. 127, note 2; 1 Am. Lead. Cas. 568; Griggs v. Selden, supra; Pole v. Leask, 33 L. J. Ch. Div. (N. S.) 155.]

To give effect in the present case to sound principles, we think the jury should be instructed that before they can hold the defendant liable on the ground that Lurie had authority, as an incident of his duties as selling agent, to contract in defendant's name for advertising, they must find the advertising was reasonable in amount and necessary, in view of all the circumstances in which Lurie was placed, and not merely appropriate or useful; that if they so find, the plaintiff was justified in relying on Lurie's apparent authority to contract for it, unless plaintiff had knowledge that he did not possess the authority, or the facts were such that a prudent man, in the exercise of ordinary diligence, would not have relied on his apparent authority.

The judgment is reversed and the cause remanded. *Nortoni, J.,* concurs; *Bland, P. J.,* concurs in paragraph one.