Wisconsin Telephone Company, Appellant, vs. Railroad Commission of Wisconsin and others, Respondents.

*January 14—February 22, 1916.*

*Telephone companies: Physical connection, when required: Railroad commission: Powers: Review of orders: Burden of proof: "Public convenience and necessity:" "Irreparable injury:" Constitutional law: Taking of property: Compensation: Prescribing conditions of connection: Preventing loss: Extra toll charges: Police power.*

1. Under sec. 1797m—4, Stats. 1911, a physical connection between telephone systems may be ordered only when public convenience and necessity require it and where it will not result in irreparable injury to the owners or users of the facilities of the systems nor in substantial detriment to the service.

2. In an action to set aside an order of the railroad commission directing a physical connection between telephone systems, the burden is on the plaintiff, under sec. 1797m—70, Stats., to show by clear and satisfactory evidence that such order was unreasonable or unlawful.

3. The word "necessity" is relative rather than absolute, and its meaning in a given case must be ascertained by reference to the context and to the objects and purposes of the statute in which it is found. In statutes relating to regulation of public utilities it will be construed to mean not absolute but reasonable necessity.

4. A physical connection between two telephone systems is required by "public convenience and necessity" within the meaning of sec. 1797m—4, Stats. 1911, if there is a strong or urgent need for such connection.

5. In an action to set aside an order of the railroad commission requiring such a connection it is *held* that the finding of the commission that necessity existed therefor is not shown to be wrong or unreasonable by clear and satisfactory evidence.

6. The words "irreparable injury" in sec. 1797m—4, Stats. 1911, are not used in the sense in which they are commonly used in equitable actions, nor is the word "injury" used in its strict legal sense as meaning a violation of a legal right; but the phrase denotes a substantial financial loss which cannot be recovered or made good.

7. Under said section the railroad commission is not authorized to order a physical connection between telephone systems in a city

if it would result in substantial loss to either of the companies involved; but if the connection can be made on lawful conditions that will obviate substantial loss the commission is empowered to order it and to fix the conditions under which it shall be made.

8. So construed, sec. 1797m—4, Stats. 1911, is not invalid as authorizing a taking of property without due process of law and without compensation, nor as denying the equal protection of the laws.

9. An order by the railroad commission in this case that a physical connection be made between two telephone systems, prescribing terms and conditions to preserve the interests of and to compensate the respective companies for the additional service furnished by reason thereof, cannot be said to be unlawful in the absence of testimony showing the effect of operation under it.

10. Such an order may, under sub. 3, ch. 546, Laws 1911, be revised from time to time by the commission, upon application of any interested party or by the commission acting on its own motion; and any order made on such application is reviewable by the courts.

11. Having no power of condemnation, the railroad commission could not order a physical connection between two telephone systems which would result in the taking of property of one of them, and then direct the exaction of an extra charge for toll service on the theory of making compensation for such property; but it might direct the exaction of such extra charge for the extra service rendered to those who take advantage of the connection, and thus prevent incidental loss that might result to one company from the connection by removing any inducement there might otherwise be for the subscribers of that company to quit it and become subscribers of the other company with which the connection was made.

12. The railroad commission is an administrative body which was not created for the purpose of deciding constitutional or legal questions, and while incidentally it may, in carrying on its functions, be called upon to state what its construction of an existing law is, it has no authority to decide whether a statutory requirement is within or without the police power.   Thus, while it may determine the question of fact whether a physical connection between telephone systems will result in loss to one company, it has no power to decide the question of law whether the loss, if any, is one which the state has a right to inflict without making compensation.

13. Sec. 1797m—4, Stats. 1911, does not authorize the requiring of a physical connection if it would deprive one of the telephone companies of the beneficial use of its local exchange, but a find-

ing of the commission that such a result would not follow cannot be said to be incorrect, in the absence of evidence to that effect.

14. The compelling of a physical connection between telephone systems does not result in any taking, in a constitutional sense, of any part of the switchboard or wires of one company and giving them to the other company and its patrons, but merely places the equipment in such condition that each company can furnish service to the patrons of the other, for which service payment is to be made. The fact that the connection involves some expense does not alter the situation, because the state has the right, within reasonable limitations, to require public service corporations to increase their facilities where the public interest requires such increase.

15. Even if, in such case, it were conceded that there was a taking of the property of one company by the requirement of a switchboard connection or by the use of its wires by patrons of the other company, such taking is a technical one only, resulting in no loss, and is within the legitimate scope of the police power.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The appellant *Wisconsin Telephone Company* owns and operates and for many years last past has owned and operated a local telephone exchange in the city of La Crosse. It also operates long-distance toll lines which reach most of the populous centers in the state, and it has made contract arrangements for connections with local toll lines where it deemed it advantageous to do so. It is controlled by the American Telephone and Telegraph Company and has telephone connections which reach out over the United States and Canada and is part of what is commonly known as the "Bell System." The defendant *La Crosse Telephone Company* also owns and operates and for many years last past has operated a local telephone exchange in the city of La Crosse. It also owns and operates toll lines in the vicinity of La Crosse and connects with the Tri-State Company, over whose lines it is able to reach St. Paul and points beyond. Both companies have connections with three local toll lines, popularly known as the "Teasdale," "Kneen," and "Gaveney" systems. The plaint-

iff's exchange in La Crosse is the oldest in point of time. The plant of the *La Crosse Telephone Company* was installed by residents of the city of La Crosse because there was dissatisfaction with the manner in which the appellant carried on its business.

The long-distance service afforded by the Bell Company was nation wide and in fact international, while that of the *La Crosse Company* was confined to a restricted area in the vicinity of the city. The Bell Company did not deem it to be for its interest to establish a physical connection with the plant of the *La Crosse Company*. A local subscriber of that company could not use his phone in talking with any one who had to be reached over the Bell lines, but would have to go to a booth or place where a Bell telephone was installed. It is also claimed that as to one of the local toll lines referred to, some of those served by it could not reach parties served exclusively by the Bell wires. This is denied by counsel for appellant, and we have found it difficult to ascertain from the record just what the fact is. Each of the companies maintained a telephone of the other in its exchange; so that if there was a long-distance call over the Bell wires for a subscriber of the *La Crosse Company,* the central office of that company was advised of that fact by telephone and in turn notified its subscriber. This arrangement and method of doing business was reciprocal.

By ch. 546, Laws 1911 (sec. 1797m—4, Stats.), physical connection was required to be made between telephone systems whenever the public convenience and necessity required such connection and it would not result in irreparable injury to the owners or users of these facilities nor in substantial detriment to the service. After the passage of this act the appellant persisted in its refusal to make the physical connection, and *Frank Winter,* a citizen of La Crosse and a subscriber of the local telephone company, commenced a proceeding before the *Railroad Commission,* which was charged with

the administration of the statute, to compel the appellant to do its part toward making the connection. The hearing on *Mr. Winter's* petition resulted in an order directing that the connection asked for be made. The plaintiff brought this action to have this order declared void. The circuit court sustained the *Commission* and dismissed the complaint. Plaintiff appeals.

For the appellant there was a brief by *Miller, Mack & Fairchild,* and oral argument by *Edwin S. Mack.* They contended, *inter alia,* that the terms of the statute do not justify the order for physical connection entered by the *Commission.* At common law a corporation engaged in a business connected with the public interest is bound to give service only through its own instrumentalities owned or controlled by it, and is under no obligation to go beyond those limits or to employ other instrumentalities unless it elects so to do. If a public utility does contract for services beyond the termination of its own instrumentalities, it has the right to select its own agencies to the exclusion of all others for such extended services. The fact that a public utility has made an agreement for the exchange of business with one company or one agency does not give to other companies or agencies a right to demand a similar exchange of business or facilities for themselves. This rule is applicable to telephone companies as well as to carriers. *Pacific T. & T. Co. v. Anderson,* 196 Fed. 699, 703; *Home T. Co. v. People's T. & T. Co.* 125 Tenn. 270, 141 S. W. 845; *Atchison, T. & S. F. R. Co. v. D. & N. O. R. Co.* 110 U. S. 667, 4 Sup. Ct. 185; *Pullman's P. C. Co. v. M. P. R. Co.* 115 U. S. 587, 6 Sup. Ct. 194; *Express Cases,* 117 U. S. 1, 601, 6 Sup. Ct. 542, 628, 1190; *Louisville & N. R. Co. v. West Coast N. S. Co.* 198 U. S. 483, 25 Sup. Ct. 745; *Donovan v. Pennsylvania Co.* 199 U. S. 279, 26 Sup. Ct. 91; *Depot C. & B. Co. v. Kansas City T. R. Co.* 190 Fed. 212; *Home T. Co. v. Sarcoxie L. & T. Co.* 236 Mo. 114, 139 S. W. 108. The act in question (if it

be constitutional) imposes on telephone companies a duty not required of them at common law, and which they unquestionably could not be required to perform in the absence of statute. Such duty is not one of the company's absolute duties, but strictly and only secondary in its nature. *Washington ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535. Whatever power there is to require the making of physical connection between lines must have been given for the benefit of the public alone, and such right must be exercised for the benefit of the public and not of another telephone company. *Interstate Comm. Comm. v. D., L. & W. R. Co.* 216 U. S. 531, 30 Sup. Ct. 415.

Public convenience and necessity do not require the physical connection ordered. Public convenience and necessity "are an urgent and immediate public need" to remedy an "evil" amounting to "an unreasonable burden upon the community." *In re Shelton St. R. Co.* 69 Conn. 626, 38 Atl. 362; *Hunter v. Mayor, etc.* 5 R. I. 325; *Schuster v. Milwaukee E. R. & L. Co.* 142 Wis. 578, 587, 588, 126 N. W. 26; *Washington ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535. If a public utility can furnish the service required, even though in fact it is not furnishing it, public convenience does not require the furnishing of the facilities through some other agency. This has been given effect by the *Commission* where a second utility sought to enter a field already served by a first. *In re La Crosse G. & E. Co.* 2 Wis. R. R. Comm. Rep. 3; *In re Cashton,* 2 Wis. R. R. Comm. Rep. 677, citing *Matter of Amsterdam, J. & G. R. Co.* 87 Hun, 578, 33 N. Y. Supp. 1009; *Weld v. Gas & E. L. Comm'rs,* 197 Mass. 556, 84 N. E. 101. The general rule is that it is the duty of a public service corporation to furnish service to the public, and not to furnish service to similar competing utilities, except in so far as members of the public desire service in the same way. Furthermore, the company is entitled to furnish service through its own instru-

mentalities, and it need not use the instrumentalities of rivals when it has its own available. *Atchison, T. & S. F. R. Co. v. D. & N. O. R. Co.* 110 U. S: 667, 4 Sup. Ct. 185; *Express Cases,* 117 U. S. 1, 601, 6 Sup. Ct. 542, 628, 1190; *Louisville & N. R. Co. v. West Coast N. S. Co.* 198 U. S. 483, 25 Sup. Ct. 745; *Southern P. Co. v. Interstate Comm. Comm.* 200 U. S. 536, 26 Sup. Ct. 330; *People ex rel. Cairo T. Co. v. Western U. T. Co.* 166 Ill. 15, 46 N. E. 731. See, also, *Lundquist v. G. T. W. R. Co.* 121 Fed. 915; *Little Rock & M. R. Co. v. St. L., I. M. & S. R. Co.* 41 Fed. 559; *Little Rock & M. R. Co. v. E. T., V. & G. R. Co.* 47 Fed. 771; *Oregon S. L. & U. N. R. Co. v. N. P. R. Co.* 61 Fed. 158; *Central S. Y. Co. v. L. & N. R. Co.* 192 U. S. 568, 24 Sup. Ct. 339; *Louisville & N. R. Co. v. Central S. Y. Co.* 212 U. S. 132, 29 Sup. Ct. 246; *Mississippi R. R. Comm. v. Y. & M. V. R. Co.* 100 Miss. 595, 56 South. 668; *Home T. Co. v. People's T. & T. Co.* 125 Tenn. 270, 141 S. W. 845, 848.

The physical connection ordered will cause irreparable injury to the plaintiff. *Wilson v. Mineral Point,* 39 Wis. 160, 164; *Eau Claire W. Co. v. Eau Claire,* 127 Wis. 154, 159, 106 N. W. 679; *Butterick P. Co. v. Rose,* 141 Wis. 533, 539, 124 N. W. 647; 23 Cyc. 356; *Ins. Co. of N. A. v. Bonner,* 7 Colo. App. 97, 42 Pac. 681, 682. The term "irreparable injury" as used in the act, which will prevent physical connection being ordered, means an injury for which the act itself does not furnish full and adequate compensation. *Carpenter v. Grisham,* 59 Mo. 247; *Western U. T. Co. v. Rogers,* 42 N. J. Eq. 311, 314, 11 Atl. 13.

The provisions of the act requiring physical connection are unconstitutional because they fail to provide compensation and are not a taking for public use. The state cannot prevent a public service company from earning on the value of its property, including the value of the established business. The value of this established business must be given recognition in rate cases and in proceedings by eminent domain as

well as in taxation cases. *Appleton W. W. Co. v. Railroad Comm.* 154 Wis. 121, 146, 142 N. W. 476; *Duluth St. R. Co. v. Railroad Comm.* 161 Wis. 245, 152 N. W. 887; *Omaha v. Omaha W. Co.* 218 U. S. 180, 202, 30 Sup. Ct. 615; *Nat. W. W. Co. v. Kansas City,* 62 Fed. 853, 865; *Gloucester W. S. Co. v. Gloucester,* 179 Mass. 365, 60 N. E. 977, 981; *Missouri, K. & T. R. Co. v. Love,* 177 Fed. 493, 496; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 69, 100 N. W. 1048. The order does not contemplate merely a mechanical union of the lines of the plaintiff and the *La Crosse Company.* It requires the use of the lines in a single circuit, and it necessarily involves the taking and use of the plaintiff's rights and property. For this right and privilege the plaintiff has a constitutional right to compensation. The law can justify such an appropriation only if it fulfils the constitutional requirement of providing compensation and that in advance. The rule is that the statute authorizing the taking of property must itself provide for the payment of damages and an adequate remedy by which the owner may procure the compensation. *Louisville & N. R. Co. v. Central S. Y. Co.* 212 U. S. 132, 144, 29 Sup. Ct. 246; *Cherokee Nation v. S. K. R. Co.* 135 U. S. 641, 660, 10 Sup. Ct. 965; *Sweet v. Rechel,* 159 U. S. 380, 16 Sup. Ct. 43; *Chicago, B. & Q. R. Co. v. Chicago,* 166 U. S. 226, 238, 17 Sup. Ct. 581; *Comm. ex rel. Norton B. of T. v. N. & W. R. Co.* 111 Va. 59, 68 S. E. 351; *Lange v. La C. & E. R. Co.* 118 Wis. 558, 563, 95 N. W. 952; *Shepardson v. M. & B. R. Co.* 6 Wis. 605; *Powers v. Bears,* 12 Wis. 213, 221; *Sherman v. M., L. S. & W. R. Co.* 40 Wis. 645, 651. There is a taking within the constitutional prohibition where the usefulness of property is substantially impaired, even though the property remain physically in the owner's possession. *Pumpelly v. Green Bay & M. C. Co.* 13 Wall. 166; *Janesville v. Carpenter,* 77 Wis. 288, 301, 46 N. W. 128. The compensation that is required is "just compensation," and this means that it must afford a full and perfect equivalent for all dam-

ages suffered. *Monongahela N. Co. v. U. S.* 148 U. S. 312, 13 Sup. Ct. 622; Lewis, Em. Dom. (3d ed.) § 360; *State ex rel. N. P. R. Co. v. Railroad Comm.* 140 Wis. 145, 121 N. W. 919. The wide difference between the undertaking to furnish telephone facilities to individuals through instruments supplied for the purpose and an undertaking to join with another telephone company in serving the patrons of that company has been recognized judicially. *Home T. Co. v. People's T. & T. Co.* 125 Tenn. 270, 141 S. W. 845, 848; *State ex rel. Goodwine v. Cadwallader,* 172 Ind. 619, 87 N. E. 644, 89 N. E. 319. For cases directly involving the constitutionality of compulsory physical connection of telephone companies, see *Billings Mut. T. Co. v. Rocky Mountain Bell T. Co.* 155 Fed. 207; *Pacific T. & T. Co. v. Eshleman,* 166 Cal. 640, 137 Pac. 1119; *Home T. Co. v. Sarcoxie L. & T. Co.* 236 Mo. 114, 139 S. W. 108; *Home T. Co. v. People's T. & T. Co.* 125 Tenn. 270, 141 S. W. 845.

Even eminent domain must be exercised for a different use—not for the same use by a different person. *West River B. Co. v. Dix,* 6 How. 507; *Lake Shore & M. S. R. Co. v. C. & W. I. R. Co.* 97 Ill. 506, 512; *Cary Library v. Bliss,* 151 Mass. 364, 25 N. E. 92, 7 L. R. A. 765, 771; *State ex rel. Kettle Falls P. & I. Co. v. Superior Court,* 46 Wash. 500, 90 Pac. 650, 652; *Eastern Wis. R. & L. Co. v. Hackett,* 135 Wis. 464, 115 N. W. 376, 1136, 1139; *State ex rel. N. P. R. Co. v. Railroad Comm.* 140 Wis. 145, 159, 121 N. W. 919. Taking the property of one public service corporation for use by another public service corporation in the same manner, would mean simply to take the property of one and give it to another without any advantage whatever to the public. *Samish River B. Co. v. Union B. Co.* 32 Wash. 586, 73 Pac. 670; 15 Cyc. 613; *Evansville & H. T. Co. v. Henderson B. Co.* 134 Fed. 973, 978; *Mississippi R. R. Comm. v. Y. & M. V. R. Co.* 100 Miss. 595, 56 South. 668; *Home T. Co. v. People's T. & T. Co.* 125 Tenn. 270, 141 S. W. 845.

For the respondent *Railroad Commission of Wisconsin*

there was a brief by the *Attorney General* and *Walter Drew,* deputy attorney general, and oral argument by *Mr. Drew.*

*Frank Winter,* respondent, *in pro. per.*

BARNES, J.    Sub. 1 and 2 of sec. 1797*m*—4, Stats., as amended by sec. 1, ch. 546, Laws 1911, read as follows:

"1. Every public utility, and every person, association or corporation having conduits, subways, poles or other equipment on, over or under any street or highway, shall for a reasonable compensation, permit the use of the same by any public utility, whenever public convenience and necessity require such use, and such use will not result in irreparable injury to the owner or other users of such equipment, nor in any substantial detriment to the service to be rendered by such owners or other users, and every utility for the conveyance of telephone messages shall permit a physical connection or connections to be made, and telephone service to be furnished, between any telephone system operated by it, and the telephone toll line operated by another such public utility, or between its toll line and the telephone system of another such public utility, or between its toll line and the toll line of another such public utility, or between its telephone system and the telephone system of another such public utility, whenever public convenience and necessity require such physical connection or connections, and such physical connection or connections will not result in irreparable injury to the owners or other users of the facilities of such public utilities, nor in any substantial detriment to the service to be rendered by such public utilities.    The term 'physical connection,' as used in this section, shall mean such number of trunk lines or complete wire circuits and connections as may be required to furnish reasonably adequate telephone service between such public utilities.

"2. In case of failure to agree upon such use or the conditions or compensation for such use, or in case of failure to agree upon such physical connection or connections, or the terms and conditions upon which the same shall be made, any public utility or any person, association or corporation interested may apply to the commission, and if after investigation

the commission shall ascertain that public convenience and necessity require such use or such physical connection or connections, and that such use or such physical connection or connections would not result in irreparable injury to the owner or other users of such equipment or of the facilities of such public utilities, nor in any substantial detriment to the service to be rendered by such owner or such public utilities or other users of such equipment or facilities, it shall by order direct that such use be permitted and prescribe reasonable conditions and compensation for such joint use, and that such physical connection or connections be made, and determine how and within what time such connection or connections shall be made, and by whom the expense of making and maintaining such connection or connections shall be paid."

The statute involved covers two distinct subjects. The first provision relates to the use by a stranger of conduits, subways, poles, and other equipment located in streets and highways and owned by some other person, firm, or corporation. Under the statute such use must be permitted where public convenience and necessity require it and where it will not result in irreparable injury to the owner or other users of the equipment, subject to the condition that a reasonable compensation must be paid for such use.

The second provision relates to the matter of physical connection between telephone exchanges, and differs from the first in one important particular at least, in that it provides for no compensation for the taking or the use of the facilities of one telephone company by another, if any such thing is contemplated. Three conditions must co-exist before a physical connection is required: Public necessity and convenience must demand the connection; such connection must not result in irreparable injury to the owners or users of the facilities of the companies that would be affected; and the connection must not result in substantial detriment to the service.

As we read the decision of the *Railroad Commission,* it construed the law as not permitting physical connection where

it would result in substantial loss to either of the companies involved.    This is not said in so many words, but it is a fairly deducible conclusion from the language used.    So construed and applied there is at the present day little room for asserting that the legislation is not a legitimate exercise of the police power vested in the legislature.    As facts the *Commission* found: (1) that public convenience and necessity required that the connection be made; (2) that such connection would not result in any substantial detriment to the service of either company; and (3) that such connection could be so made as not to result in irreparable injury, or in fact in any injury, to either of the utilities involved.    The court sustained the order of the *Commission,* but appears to have reached the conclusion that the order was right on a different ground, or at least an additional one, from that on which the *Commission* based its decision.    The opinion of the court would indicate that it entertained the view that although a part of plaintiff's property was taken without compensation and although the application of the statute might result in greatly depreciating the value of its local exchange at La Crosse, still it was a valid exercise of the police power.

The plaintiff argues (1) that public necessity and convenience did not require a physical connection in this instance, and that the finding to the contrary has no sufficient support in the evidence and is against the testimony offered; (2) that the order will result in irreparable injury to it in at least four particulars: (a) it will practically destroy its local exchange at La Crosse; (b) it will divert toll business to La Crosse which plaintiff now receives over independent lines with which it is connected, to the local company; (c) it will enable the local company to divert unprofitable outgoing toll business from its own lines to those of the plaintiff; (d) it will enable the local company to ascertain what toll lines of the plaintiff in the vicinity of La Crosse are profitable, and result in duplication; (3) that the order and

statute violate plaintiff's constitutional rights, in that they take its property without due process of law and without compensation and deny to it the equal protection of the laws.

If the contention is correct that the finding of convenience and necessity should not be permitted to stand, it is decisive of the case and no other question need be considered. The question raised is one of fact, and the plaintiff has against it the conclusion reached by the *Commission,* which has also received the sanction of the trial court. The burden rested on the plaintiff in the lower court to show by clear and satisfactory evidence that the determination of the *Railroad Commission* was unreasonable or unlawful. Sec. 1797m—70, Stats. At the time of the hearing before the *Commission* there were 1,786 subscribers to the local exchange of the plaintiff at La Crosse, and 3,082 subscribers to the exchange of the local company. Included in these figures are 561 users who were subscribers to both exchanges. Under conditions that existed, where there was a call over the Bell toll line for a resident of La Crosse who was a subscriber to the exchange of the local company but not to that of the plaintiff, an operator in the local company's office was notified of such call by telephone. The operator then notified its subscriber of the call and such subscriber could respond only by going to a Bell station or to a place where a Bell phone was in use. In the meantime the toll line might be pre-empted by other users and considerable delay caused to the person who was obliged to wait. There was testimony tending to show that the average waiting time was half an hour. Delay and inconvenience also no doubt often occurred to the person calling who desired to talk with a party at La Crosse. If the caller's place of business was equipped with a Bell telephone and the caller in the meantime could proceed with his usual work, the inconvenience might not be great, but if made from some station removed from his place of business it might be very considerable. There can be no doubt that this method of

doing business was unsatisfactory, because of inconvenience to the party called and often to the caller on account of delay in securing a connection after the lapse of time that would be necessary in order to enable the party called to reach a Bell phone.     The same situation arose where a subscriber to the local exchange of the plaintiff who was not a subscriber to the local exchange of the *La Crosse Telephone Company* desired to use the toll lines of the latter company or its connections at points not served by the toll lines of the plaintiff.     La Crosse is a city of about 30,000 inhabitants, and it is probable that many persons had occasion to use the toll lines of one or both companies whose convenience might in some degree at least be promoted by the physical connection asked for.     Be this as it may, there were over 1,200 subscribers to the exchange of the plaintiff and more than 2,500 subscribers to that of the local company whose convenience might well demand that the connection be made.     It is no doubt true that not all of these subscribers used the toll lines and that some of them seldom used them.     But the *Commission* found that the toll calls for one month amounted to $6,000 for the Bell line and to about $4,500 for the local system; so that it is apparent that the toll lines are liberally patronized.     The inconvenience in sending outgoing messages would be practically the same for residents of La Crosse as the receiving of incoming ones.

The number of people who would be affected by the connection sought is by no means insignificant.     It is large enough so that if the connection is a matter of convenience and necessity it is also a matter of public convenience and necessity.     About the connection being a convenience there can be no doubt.     This, however, is not sufficient, because it must also be a necessity.     The words are not synonymous and effect must be given both.     The word "convenience" is much broader and more inclusive than the word "necessity."     Most things that are necessities are also conveniences, but not all

conveniences are necessities. If we regard the word "necessity" as meaning something that is indispensable, it could not be said that the connection ordered in the present case was a "necessity." But if such a definition were adopted it would leave the law so that it would be a thing of ornament rather than of use, because it is improbable that a situation would arise where it could be said that a physical connection between telephone lines was indispensable to the public. The legislature certainly had some situations in mind to which the law was intended to apply. The word "necessity" has been used in a variety of statutes, particularly in those enacted in reference to condemnation and to regulation of public utilities. It is even more frequently found in our so-called "Sunday laws." It has been generally held to mean something more nearly akin to convenience than the definition found in standard dictionaries would indicate. So it is said the word will be construed to mean not absolute but reasonable necessity. *Samish River B. Co. v. Union B. Co.* 32 Wash. 586, 73 Pac. 670; *Wardsboro v. Jamaica,* 59 Vt. 514, 9 Atl. 11; *Bryan v. Branford,* 50 Conn. 246, 253; *Pepin Tp. v. Sage,* 129 Fed. 657, 665. Inconvenience may be so great as to amount to necessity. *Lawton v. Rivers,* 2 McCord (S. C.) 445, 13 Am. Dec. 741. A strong or urgent reason why a thing should be done creates a necessity for doing it. *Todd v. Flournoy's Heirs,* 56 Ala. 99, 113. The word connotes different degrees of necessity. It sometimes means indispensable; at others, needful, requisite, or conducive. *St. Louis G. A. Co. v. Wanamaker,* 115 Mo. App. 270, 90 S. W. 737, 743. The words "convenience and necessity" mean urgent immediate public need. *Application of Shelton St. R. Co.* 69 Conn. 626, 38 Atl. 362. So held under a statute prohibiting the construction of parallel lines of street railroad except when public convenience and necessity required it. Necessity does not exist unless the inconvenience would be so great as to amount to an unreasonable burden on the com-

munity. *Hunter v. Mayor, etc.* 5 R. I. 325. The Michigan court holds that if a proposed improvement is a convenience of sufficient importance to warrant the expense of making it, it is a public necessity. *Comm'rs of Parks v. Moesta,* 91 Mich. 149, 51 N. W. 903. The Kentucky court holds that a thing which is expedient is a necessity. *Warden v. M., H. & E. R. Co.* 128 Ky. 563, 108 S. W. 880. The term is relative rather than absolute. No definition can be given that would fit all statutes in which the word has been used. The meaning in a given case must be ascertained by reference to the context and to the objects and purposes of the statute in which it is found. If there was a strong or urgent need of the connection here sought, then there was a necessity for it, and the finding that necessity existed is not shown to be wrong or unreasonable by clear and satisfactory evidence.

This brings us to a consideration of the injurious results which the appellant insists will flow from the statute and the order of the *Commission* made thereunder. The first of these suggested is the most substantial. The local exchange of the plaintiff was constructed before that of the local company, at a cost of $240,000. The local company is owned by resident stockholders who have been active in extending its business and have brought strong influence to bear on telephone users to patronize their company, with the result that a large exchange was built up to a considerable extent at least at the expense of the older company, because there has been a marked falling off in the number of its patrons since its competitor appeared in the field. The exchange of the local company being now much larger than that of the plaintiff, it is more attractive and perhaps more useful to a telephone user than is that of the plaintiff. The appellant contends, logically enough, that the only substantial hold which it has on so much of its business as remains is the advantage it can offer its subscribers of direct toll connections with all important points in the United States and Canada; that it is entitled to this advantage, and that if taken away its local exchange will in-

evitably lose most of the business it has and its investment will be largely destroyed, because the value of its property will be reduced at least fifty per cent. It further contends that not only will its business and property be largely destroyed, but that such business will be transferred to a competitor without a cent of compensation, and that such a result would be an unlawful taking of property, practically to the same extent that a law would be which allowed railroads to operate their properties but prohibited them from exacting any substantial compensation for the service performed. The *Railroad Commission* substantially finds that an unconditional order for annexation would produce the results claimed, and such finding is well supported by the evidence offered and appears to be an entirely reasonable result to reach. The conclusion of the *Commission,* however, was that from a practical standpoint the case stated was really a hypothetical one and one to which the law did not apply. As before stated, it took the ground that a connection could not be ordered if it resulted in substantial loss to either of the companies involved, and that inasmuch as it was empowered to fix the conditions under which the connection should be made, the question before it in any given case was, Could connection be made on lawful conditions that would obviate substantial loss? If so, it was empowered to act, provided other requisites existed. If not, the case was one which would fall without the statute and one where it had no power to order a connection.

Sub. 2 of the statute quoted provides that in case the utilities interested shall fail to agree upon the physical connection desired, or upon "the terms and conditions upon which the same shall be made," the *Railroad Commission* may fix such "terms and conditions" on proper application. After stating that the law did not contemplate a physical connection which would render the earning power of the local exchange of the plaintiff practically nil, the *Commission* in its decision proceeds:

"No subterfuge can be indulged under the statute which

will have the effect of depriving any private property, employed in a public service, of its earning capacity.

"In the peculiar situation found in the instant case, it is possible to prescribe terms and conditions which will preserve the interests of the utilities respectively after the connection has been made. The subscriber of one company desiring toll service over the lines of the other company must pay, in addition to the rate charged the patrons of the latter company, a reasonable compensation for the additional service. Neither company will be permitted to absorb such additional charge, but the same must be paid by the patrons of either company using the toll lines of the connecting company. This will not result in any discrimination between subscribers of the same exchanges, but will result in a just and necessary discrimination between the subscribers of the two exchanges. A subscriber who has not installed the telephones of both exchanges is not entitled to the toll service of both exchanges without paying an additional charge to the exchange with which he is not connected when desiring to use its toll-line facilities.

"There is no evidence showing that any irreparable injury will or can result to the owner or other user of the facilities of the respondent companies. Under the terms and conditions outlined above the business of neither company will be disturbed and their relations to each other with respect to existing local business will be the same as at present. Certainly neither can suffer any injury under the circumstances."

In the order presently before us the terms and conditions were not definitely fixed because the parties had the right to agree upon them if they were able to do so. Being unable to agree, the *Commission* made a subsequent order, which will be found in *Winter v. La Crosse Tel. Co.* 15 Wis. R. R. Comm. Rep. 36, 42. While this order is not directly involved in this proceeding, it is instructive as illustrative of what the *Commission* had in mind. The part of it material to this case is as follows:

"It is further ordered, that each subscriber of the *Wisconsin Telephone Company* desiring service over the toll

lines of the *La Crosse Telephone Company* shall be charged
for each message, in addition to the regular charge of the *La
Crosse Telephone Company,* as follows:

"1. For all distances of not over 50 miles from the office
of the *La Crosse Telephone Company,* 5 cents; for all distances over 50 miles and not over 100 miles from such office,
10 cents; and for all distances over 100 miles from such office, 15 cents. All distances shall be measured by air line.

"It is further ordered, that each subscriber of the *La
Crosse Telephone Company* desiring service over the toll
lines of the *Wisconsin Telephone Company* shall be charged
for each message, in addition to the regular charge of the
*Wisconsin Telephone Company,* as follows:

"2. For all distances of not over 50 miles from the office
of the *Wisconsin Telephone Company,* 5 cents; for all distances over 50 miles and not over 100 miles from such office,
10 cents; and for all distances over 100 miles from such office, 15 cents. All distances shall be measured by air line.

"3. Neither of the companies shall absorb any such additional charges, but shall collect the same from its subscribers;
but each of the companies shall be liable to the other and shall
pay to the other the long-distance tariff toll plus such additional charge.

"If this division of tolls, after a fair trial, shall be found
to be inequitable, and the companies cannot agree upon a
proper division of the tolls, the *Commission* will by supplemental order establish such division.".

It will be observed that the *Commission* takes the position
that the physical connection desired could be made without
taking the plaintiff's property in the constitutional sense and
without detriment to it. There is evidence *pro* and *con* as to
the effect of such connection. It is necessarily opinion evidence, and in the absence of testimony showing the effect of
operation under the order it is impossible to say that the
*Commission* is not right. Its judgment is that the extra
charge provided for will deter present subscribers to the local
exchange of the plaintiff from discontinuing the use of the
Bell phone and substituting that of the local company. The
correctness of this judgment should be subjected to the acid

test of experience before it is condemned. The law makes provision for the protection of plaintiff's rights if they have been unduly trenched upon. Sub. 3, sec. 1797m—4, Stats. 1911, provides that the order of the *Commission* may be revised from time to time on the application of any interested party or by the *Commission* acting on its own motion. Any order made on such application would of course be reviewable by the courts.

It is suggested that it was not within the power of the *Railroad Commission* to make such a regulation as it proposed to make in its original decision and as it afterwards made in its supplemental order. If these orders were made on the theory that there was a taking of property for which compensation should be made and that such property was paid for by the exaction of the extra charge provided for, we do not see how they could be sustained, because no power of condemnation is conferred on the *Commission*. The orders, however, are made on the theory that there is no taking. The charge is exacted because an extra service is furnished to those who take advantage of the connection and for the purpose of removing any inducement there might be on the part of plaintiff's subscribers to quit it because of the connection and become patrons of the local exchange of the rival company. The purpose of the regulation is not to pay for any taking of property, but to prevent incidental loss that might result to the plaintiff from the connection. Viewed in this light, we see no objection to the regulation and think it comes fairly within the statute.

We shall not discuss in detail objections (b), (c), and (d), hereinbefore enumerated, as such discussion would serve no useful purpose. The *Commission* of necessity must have concluded that such objections were not well taken, or that they could and would be obviated by the regulations which it intended to prescribe. Sufficient answer can be made to all of them in the absence of any showing as to the practical ef-

fect which the connection has had upon the revenues of the plaintiff. It was stated on the argument that a physical connection was in fact made not long after the entry of the order of August 20, 1914. By the time the decision in this case is announced the parties will be able to present to the *Commission,* if they so desire, facts instead of theories and opinions, and if the conclusion first reached proves to be wrong it can be rectified.

The constitutionality of the law is attacked as well as the validity of the order of the *Commission* made thereunder. If the law was correctly interpreted by the *Commission* there is no substantial basis for asserting that it is subject to any constitutional infirmity. If a mistaken interpretation has been placed upon it, another question arises, because it is essential to know what a law means before we proceed to pass upon its validity. The uncertainty in this case, if there is any, arises out of the meaning of the words "irreparable injury" as used in the act. The phrase is most frequently found in the books in cases dealing with equity suits, irreparable injury being the basis on which most equity actions rest. As there used, this court has said an injury is irreparable when it is of such a nature that the injured party cannot be adequately compensated therefor in damages, or when the damages which may result therefrom cannot be measured by any certain pecuniary standard. *Eau Claire W. Co. v. Eau Claire,* 127 Wis. 154, 159, 106 N. W. 679; *Wilson v. Mineral Point,* 39 Wis. 160. The appellant urges that the legislature had this definition in mind when it passed the act, and that, inasmuch as the physical connection would result in serious loss to it in the particulars claimed, and the amount of such loss could not be ascertained, the *Commission* had no authority under the law to order the connection. The *Commission* meets this by saying that the plaintiff would suffer no loss if the connection were made under proper regulations.

It would seem apparent that the legislature did not use the phrase in the sense referred to.     While situations would arise where the damages resulting from ordering a connection could not be adequately compensated for or measured in money value, cases might just as well arise where they could be. The legislature hardly intended that where the amount of money compensation could not be fixed no connection should be made, while, if the amount of damages that would result could be ascertained, then a connection should be made.     The owner would be just as much entitled to relief in the one case as in the other, although the character of the relief might be different.     There is no provision for compensation in the act, so none could be recovered where damages resulted and were ascertainable, although a connection would have to be made. Such a construction would, to say the least, raise grave doubts as to the validity of the law.     The objection to the suggested meaning of the phrase "irreparable injury" holds good whether we consider that the legislature had in mind the legal definition of the word "injury" or the popular meaning of it.     If loss results which the state cannot inflict in the exercise of the police power, the loser is entitled to compensation, and this right exists where the damages can be ascertained to a certainty as fully as where they cannot be.     We conclude that the legislature did not use these words in the sense in which they are understood in equity law.

There is some doubt as to whether the legislature used the word "injury" in its popular or in its legal sense.     Ordinarily the word "injury" is used to designate a thing which inflicts harm or damage, but a thing which inflicts more than a slight loss.     Cent. Dict.     And the word "irreparable" means something that cannot be repaired or recovered or made good.     So where there is substantial loss or damage which is not recoverable, it is entirely correct to say that there is irreparable injury.     Losses caused by fire where there is no insurance, or by flood or pests, as well as many

others, are commonly and properly referred to as irreparable injuries.

The generally accepted legal definition of the word "injury" is more restricted. A thing done is said to be an injury when it violates a legal right of a party. Certain acts which inflict loss are held to be *damnum absque injuria.* Some authorities interpret the phrase as meaning "injury without wrong" (Bouv. Law Dict.), and others, "loss without injury" (2 Words & Phrases, 1823), and still others, as "a loss without wrong" (13 Cyc. 255). Losses are frequently occasioned by a legitimate exercise of the police power for which no recovery can be had because no legal right has been violated. The words "irreparable injury" found in this statute are used in one of the two senses last referred to. It is not very material to a decision of this case which definition is adopted, but the question is directly before us and it may be important in the administration of the law to suggest what we deem to be the true interpretation.

If we say they are used in the sense last discussed, then the words perform no function and are mere surplusage, unless we say that what the legislature meant was to require a physical connection in every case where in the exercise of its police power it had the right to require it, provided public convenience and necessity would be thereby promoted and substantial detriment to the service would not follow. This construction would require the connection to be made unless it would result in legal damage to or violate a legal right of one of the parties concerned. By legal damage we mean loss which the state could not lawfully inflict under its police power and which of course would not fall within the class of wrongs to which the rule of *damnum absque injuria* applies. This would be an unusual form of legislation, to say the least. It is equivalent to a command in the first instance to make a physical connection, provided the state in the exercise of its police power has the right to order it. The utilities

would have to decide in each instance whether the power was exceeded or not. If one or both of them should decide against the connection, then the question, which is one of law, is passed up to the *Railroad Commission* for decision under the second subsection of the act. This is an administrative body which is not created for the purpose of deciding grave constitutional or even legal questions. Incidentally it may in carrying on its functions be called upon to state what its construction of existing law is. This is very different from calling on it for decision as to whether a statutory requirement is within or without the police power. The question whether a telephone company would sustain a loss in a given case by reason of a physical connection is one of fact. But if loss be found, the question whether the state has the right to inflict it without compensation is one of law. The impropriety of attempting to vest this kind of jurisdiction in the *Railroad Commission* is well pointed out in *Chicago & N. W. R. Co. v. Railroad Comm., ante,* p. 91, 155 N. W. 941.

The situation presented is such that it is difficult to see how substantial loss would result to one utility in case a connection was ordered, without resulting in a corresponding benefit to the other. If such other is benefited, it should in all fairness be required to pay. It is hardly conceivable that the legislature had a purpose in mind to discriminate against public utilities by taking away the business of one without any compensation and handing it over to the other, if we were to concede for the moment that it might do so. Public convenience and necessity might possibly be promoted by entirely doing away with the local exchange business of the plaintiff, assuming that this could lawfully be accomplished. But such convenience and necessity does not require that its business be in effect handed over as a gift to its rival. If the right exists to do away with this asset, then the right exists to compel the beneficiary to pay for it. Both companies are in La Crosse because the people through their representa-

tives granted them franchises.    The inconvenience of having
two local telephone systems in a city is obvious to any one
familiar with their operation.    Assuming that efficient regu-
lation can be had, duplication cannot be justified from any
economic standpoint, and the legislature has recognized this
fact in the law under consideration (sec. 1797m—74).    In
dealing with existing situations it is not supposable that it
did not intend to deal with them equitably, and it is our opin-
ion that the *Commission* took a correct view of the statute
and that such statute does not contemplate that a connection
should be made where it would result in substantial loss to
one of the utilities affected thereby, and that the word "in-
jury" was used to denote substantial financial loss.    The con-
nection ordered entailed some expense upon the plaintiff.
This expense was incurred in providing a facility that was
convenient to the public in transacting business with plaint-
iff and can in no correct sense be regarded as a loss.    Neither
could the amount of it be considered substantial in a matter
of this kind.

   We construe the statute as not authorizing physical con-
nection if it would deprive the plaintiff of the beneficial use
of its local exchange.    If the facts found are correct no such
result will follow, and we cannot say that the findings of fact
are not correct.    This eliminates the contention of the plaint-
iff that is most forcefully urged.

   Plaintiff's counsel further argue quite strenuously that the
use of its wires and of part of its switchboard and distribut-
ing frame is taken from it by the order of the *Commission* and
given to the *La Crosse Telephone Company* without compen-
sation.    Whenever the wires of the plaintiff are reached and
used over those of the local company, this is claimed to be a
taking of the 'plaintiff's property for the use and benefit of
that company because plaintiff is deprived of its property
while the use continues.    We do not understand this to be
the situation or the legal effect of what has been done.    We

do not see how it can be said that the *La Crosse Company* either takes or uses the wires or appliances of the plaintiff. Whatever appropriation there is, is by the person who is using the wire, and for this he pays the regular toll charge and something additional besides. The patron is using the precise thing which the plaintiff has to sell, the thing from which its earnings are derived, and the thing which it is obliged to furnish the public. It is difficult to see how a patron of the *La Crosse Company* by using its local exchange to connect with the Bell Company's toll line is taking the property of the latter to any greater extent that he would be if he stepped into its central office and had the party he desired to reach called from there. It is true that a connection must be established between the wires of the local company and the switchboard of the plaintiff. To say that this is a taking of property is far-fetched. There may be a technical appropriation, but there is no taking in the constitutional sense. Neither would the fact that there was some expense incurred alter the situation, because it is the right of the state within reasonable limitations to require public service corporations to increase their facilities where the public interest requires the increase. Instead of damage resulting from the connection ordered, it would be more reasonable to suppose that both profit and convenience would result therefrom. We do not see how the switchboard connection required can entail any substantial loss upon the plaintiff. If it should be conceded that there was a taking of plaintiff's property by either of the requirements referred to, it is a technical taking that results in no loss and it is entirely within the legitimate scope of the police power. The legislature has seen fit to exercise such power, provided no substantial loss would result. The authorities we deem to be quite conclusive on this point. *Wis., M. & P. R. Co. v. Jacobson,* 179 U. S. 287, 21 Sup. Ct. 115; *Mich. Cent. R. Co. v. Mich. R. R. Comm.* 236 U. S. 615, 35 Sup. Ct. 422; *Grand Trunk R. Co. v. Mich. R. R.*

*Comm.* 231 U. S. 457, 34 Sup. Ct. 152; *Chicago, M. & St. P. R. Co. v. Iowa,* 233 U. S. 234, 34 Sup. Ct. 492; *State ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535; *Atlantic C. L. R. Co. v. North Carolina Corp. Comm.* 206 U. S. 1, 27 Sup. Ct. 585; *Minneapolis & St. L. R. Co. v. State ex rel. R. R. & W. Comm.* 193 U. S. 53, 24 Sup. Ct. 396; *Pacific T. & T. Co. v. Wright-Dickinson H. Co.* 214 Fed. 666; *Pioneer T. & T. Co. v. Grant Co. R. T. Co.* (Okla.) 119 Pac. 968; *Pioneer T. & T. Co. v. State,* 38 Okla. 554, 134 Pac. 398; *Hooper T. Co. v. Nebraska T. Co.* 96 Neb. 245, 147 N. W. 674; *State ex rel. Public Service Comm. v. Skagit River T. & T. Co.* 85 Wash. 29, 147 Pac. 885. Under the facts found and sustained by the evidence irreparable injury, within the meaning of the statute, did not result to the plaintiff from the order complained of. We do not think that the order resulted in any taking of the plaintiff's property, but if there is a taking it has not resulted in substantial damage or irreparable injury and is one which the legislature had a right to provide for.

*By the Court.*—The judgment appealed from is affirmed, without prejudice to the right of the plaintiff to make a subsequent application to set the order aside if it so desires.

The following opinion was filed March 2, 1916:

TIMLIN, J. I concur in the result, but disclaim any responsibility for or acquiescence in what is said in the opinion of the court with reference to irreparable loss and to limitations there suggested upon the police power of the state.